IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| IN RE: IOWA READY-MIX CONCRETE ANTITRUST LITIGATION | No. C10-4038 MWB (CONSOLIDATED CASES)<br><br>**VS HOLDING COMPANY'S BRIEF IN SUPPORT OF RESISTANCE TO PLAINTIFFS' MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT** |

**TABLE OF CONTENTS**

I.   PROCEDURAL HISTORY...........................................................................................1

II.  PLAINTIFFS' PROPOSED CLAIM THAT VS HOLDING BE HELD LIABLE FOR ILLEGAL AGREEMENTS OR CONDUCT AFTER JANUARY 14, 2008, IS FUTILE BECAUSE VS HOLDING WITHDREW FROM ALLEGED ILLEGAL AGREEMENTS UPON SALE OF ITS ASSETS TO GCC................................................................... 1

III. THE PROPOSED NEW COMPLAINT DOES NOT ALLEGE SUFFICIENT FACTS TO PLAUSIBLY SHOW ANY ILLEGAL AGREEMENT BETWEEN ALLIANCE CONCRETE AND GREAT LAKES PRE-DATING THE ASSET SALE .......................... 5

  A.  That competitors in a market "discussed prices" is not sufficient from which to reasonably infer the existence of a price-fixing agreement .................................... 6

  B.  Alleging a single parallel price change does not make a pre-2008 price-fixing agreement between Alliance Concrete and Great Lakes plausible........................ 8

  C.  The complaint also fails to allege facts from which to infer the existence of a pre-2008 agreement to allocate territory between Alliance Concrete and Great Lakes 9

IV. PLAINTIFFS HAVE NOT PLED SUFFICIENT FACTS TO PLAUSIBLY SUGGEST VS HOLDING INVOLVEMENT IN "THE GCC/SIOUXLAND CONSPIRACY"................ 13

I.     PROCEDURAL HISTORY

VS Holding in its prior Motion to Dismiss (Docket No. 151), joined in GCCA's motion to dismiss and also asserted that public records showed, and the Plaintiffs' could not plead otherwise, that the ready-mix concrete business of VS Holding's predecessor, Alliance Concrete, Inc., was totally sold to GCC on January 14, 2008, so that VS Holding could not possibly have engaged in any conspiracy after that date. VS Holding also pointed out that Plaintiffs had not sufficiently alleged any specific conduct during 2006 and 2007 -- the two years preceding its total divestment of any ready-mix concrete business -- for which VS Holding could be liable.

Plaintiffs' Motion for Leave to File Second Amended Consolidated Complaint not only fails to address the Court's Order of Dismissal, as set out in GCCA's Resistance to Plaintiffs' motion in which VS Holding joins, but also fails to address the issues raised in VS Holding's own prior Motion to Dismiss. The sale of Alliance's entire ready-mix business on January 14, 2008, remains undisputed in Plaintiffs' new pleading, as does the non-involvement of VS Holding in any ready-mix business of any sort after that date.

II.    PLAINTIFFS' PROPOSED CLAIM THAT VS HOLDING BE HELD LIABLE FOR ILLEGAL AGREEMENTS OR CONDUCT AFTER JANUARY 14, 2008, IS FUTILE BECAUSE VS HOLDING WITHDREW FROM ALLEGED ILLEGAL AGREEMENTS UPON SALE OF ITS ASSETS TO GCC

Plaintiffs make allegations in their proposed Second Amended Consolidated Complaint ("SACC") apparently trying to support a claim that VS Holding should be jointly and severally liable for any illegal agreements or conduct at any time, even those post-dating the sale of all the assets of Alliance Concrete, Inc. to GCC on January 14, 2008 (SACC ¶¶154–165). But Plaintiffs' factual pleading does not support this asserted post-sale liability. In Count I,

1

Plaintiffs' plead that each year 2006 through 2009 Steve VandeBrake at Alliance discussed with Tri-State in the spring of that year pricing for that year. But Plaintiffs then allege that VS Holding is liable for the 2008 and 2009 discussions even though VS Holding was no longer in the ready-mix business at that time and Steve VandeBrake was working for a completely different company (GCC Alliance). In Count II, Plaintiffs' plead that there were "discussions" with Great Lakes prior to 2008, but the only evidence they plead of illegal agreement is limited to the period after the sale of all Alliance's assets to GCC on January 14, 2008, and no one involved worked for VS Holding. In Count III, Plaintiffs' plead that VS Holding is liable for a conspiracy with Siouxland where the very first contact of any sort between the parties to that conspiracy is alleged not to have occurred until June 2008, and no one involved worked for VS Holding.

The balance of this section will present law showing why Plaintiffs' proposed new pleading, just like the prior pleading that the Court dismissed, does not meet the minimum pleading requirements under Bell Atlantic Corp. v. Twombly, 550 U.S. 554 (2007), to make such claims of post-sale liability. The following two sections then will address some particular inadequacies in Plaintiffs' pleading regarding Great Lakes and Siouxland in Counts II and III, respectively.

Plaintiffs' allegation that VS Holding should be liable for alleged illegal agreements occurring after the sale of its entire ready-mix business is simply a boilerplate restatement of the legal standard for withdrawal from an antitrust conspiracy (SACC ¶158). Plaintiffs' have not even attempted to correct the deficiency in this regard noted by the Court in their First Amended Complaint. The Court noted that the factual allegations in their complaint were inadequate to show that any antitrust conspiracy claim could be asserted against VS Holding for conduct of

Steve VandeBrake occurring after its sale to GCC. Order at 26, f.n. 4. But there are no sufficient factual allegations in the proposed Second Amended Complaint either.

In order to withdraw from a conspiracy, a defendant must demonstrate that he took affirmative action to withdraw from the conspiracy by making a clean breast to the authorities <u>or by communicating his withdrawal in a manner reasonably calculated to reach his co-conspirators</u>. United States v. Jackson, 345 F.3d 638, 648 (8th Cir. 2003). A cessation of activities, alone, is not sufficient to establish a withdrawal from the conspiracy. Id.

In United States v. United States Gypsum Co., 438 U.S. 422 (1978), the Supreme Court reversed the trial court based in part upon an erroneous instruction on the issue of withdrawal from an antitrust conspiracy.[1] The court held that the instruction improperly limited the jury's consideration to only "two circumscribed and arguably impractical methods of demonstrating withdrawal from the conspiracy." Id. at 363–65. The court indicated that effective acts of withdrawal by a conspirator could include conduct not specified in the jury instruction. Id. The court noted that any "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have generally been regarded as sufficient to establish withdrawal or abandonment." Id. This broad formulation of an effective withdrawal from a conspiracy could include a company completely going out of business if that event is communicated to co-conspirators in a manner reasonably calculated to

---

[1] The jury had been charged as follows:

> In order to find that a defendant abandoned or withdrew from a conspiracy prior to December 27, 1968, you must find, from the evidence, that he or it took some affirmative action to disavow or defeat its purpose. Mere inaction would not be enough to demonstrate abandonment. To withdraw, a defendant either must have affirmatively notified each other member of the conspiracy he will no longer participate in the undertaking so that they understand they can no longer expect his participation or acquiescence, or he must make disclosures of the illegal scheme to law enforcement officials....

Id. at 463–64.

reach them. Certainly confessing to the authorities is <u>not</u> the only means of effective withdrawal. Id.

It appears that neither the United States Supreme Court nor the Eighth Circuit has directly considered whether a company's publicized liquidation and cessation of doing business constitutes an effective withdrawal from alleged antitrust conspiracy as a matter of law. However, other courts have held as a matter of law that such action constitutes an effective withdrawal from an alleged antitrust conspiracy. For example, in <u>Morton's Market, Inc. v. Gustafson's Dairy, Inc.</u>, 198 F.3d 823 (11th Cir. 1999), <u>amended in part</u>, 211 F.2d 1224, <u>cert. denied</u>, 529 U.S. 1130 (2000), plaintiff milk retailers brought an antitrust action against large dairy producers alleging a price-fixing conspiracy. One of the alleged defendant co-conspirators had sold its dairy and gone out of business. The court held:

> Did [the selling defendant] effectively withdraw? With the sale of its dairy, [defendant] certainly "retired" and totally severed its ties to the milk price-fixing conspiracy. It did nothing more to assist or participate in the price-fixing activities of the other dairies. This retirement was communicated to the other dairies by the media. They knew from that time on [that defendant] would not lend its services to the conspiracy. Thus, the purposes of the conspiracy were defeated at least as to [that defendant]. We conclude, therefore, that [defendant] did effectively withdraw from the price-fixing conspiracy upon the sale of its dairy.

<u>Id.</u> at 839. It is not pled by Plaintiffs, and not plausible to assume, that Chad Van Zee of Tri-State or Kent Stewart of Great Lakes were wholly unaware that Alliance Concrete, Inc. had ceased doing business upon the sale of all its assets to GCCA. Indeed, Plaintiffs' allege that both of them actually discussed with Steve VandeBrake what prices GCCA would be charging in 2008 and 2009 in his capacity as sales manager for GCCA.[2]

---

[2] It is also in the public record that Alliance Concrete's sale to GCC was announced publicly on January 18, 2008. See authenticated notice attached hereto as Exhibit 1. Plaintiffs' plead no facts to the contrary.

Analogously, in United States v. Nerlinger, 862 F.2d 967 (2d Cir. 1988), the court held that a defendant's closing of a financial account used to effectuate the conspiracy was an effective withdrawal because it "disabled him from further participation [in the conspiracy] and made that disability known to [his co-conspirator]. That is enough." Id. The court noted that the effective communication of abandonment to co-conspirators does not require "the hiring of a calligrapher to print formal notices of withdrawal to be served upon co-conspirators." Id.

Since Plaintiffs' proposed Second Amended Complaint fails to correct the deficiencies noted in the Court's prior dismissal Order, Plaintiffs' motion to file this new pleading should be denied.

### III. THE PROPOSED NEW COMPLAINT DOES NOT ALLEGE SUFFICIENT FACTS TO PLAUSIBLY SHOW ANY ILLEGAL AGREEMENT BETWEEN ALLIANCE CONCRETE AND GREAT LAKES PRE-DATING THE ASSET SALE

Although the Department of Justice's criminal information limited its case regarding illegal agreements involving Great Lakes to those between GCCA and Great Lakes in 2008 and 2009, Plaintiffs' proposed Second Amended Complaint asserts that there were two types of illegal agreements between Steve VandeBrake and Kent Stewart of Great Lakes pre-dating Alliance's sale of its entire ready-mix business to GCC on January 14, 2008 (SACC ¶¶113–135 and Count II). Neither VandeBrake nor Stewart pled guilty to such pre-2008 illegal agreements. Even Plaintiffs' allegations in support of "The GCC/Great Lakes Conspiracy" shows that any relatively specific alleged facts suggesting any illegal agreements between VandeBrake and Stewart are almost entirely limited to the years 2008 and 2009. Plaintiffs' only factual allegations referencing years prior to 2008 in this section of the Second Amended Complaint are sparse:

5

- "According to Defendant Stewart's first statements to the federal investigators, he and defendant VandeBrake first begun discussing prices their respective companies charged for Ready-Mix Concrete in 2006." ¶115.

- "Furthermore, analysis shows that, for 3,350 and 4,000 mixes, between 2006 and 2007, Great Lakes and GCC each increased its sheet price by the same increment as the other." ¶120.

- In statements to federal investigators, Stewart admitted that "in 2007", he met with VandeBrake to complain about Alliance Concrete pouring concrete near a Great Lakes plant. ¶128.

These limited allegations are not sufficient alone or in combination to plausibly assert any pre-2008 illegal agreements between VandeBrake and Stewart. Each will be discussed next.

### A. That competitors in a market "discussed prices" is not sufficient from which to reasonably infer the existence of a price-fixing agreement

Plaintiffs' allege in support of their allegation of a pre-sale price-fixing agreement with Great Lakes that Kent Stewart made statements to federal investigators that he and VandeBrake first began "discussing prices" their respective companies charged for concrete in 2006.[3] Plaintiffs' make no further specific allegation regarding the substance of those discussions, whether those discussions occurred before or after each of the companies established their respective annual price lists, or that Stewart admitted to investigators that these discussions ripened into an agreement to charge certain prices or increase prices by any amount. No month or day is alleged when these discussions took place.

That two participants in a market might discuss or exchange information regarding prices is not, alone, enough from which to reasonably infer the existence of a price-fixing agreement. Indeed, Plaintiffs themselves alleged facts showing that ready-mix concrete companies can learn of each other's prices in the absence of any conspiracy. (SACC ¶48). In United States v. United

---

[3] As was developed at Stewart's sentencing hearing, this statement appeared to be mistaken as to the year.

6

States Gypsum Co., 438 U.S. 422, 441 n.16 (1978), the United States Supreme Court explained that the "exchange of price data and other information among competitors does not invariably have anti-competitive effects; indeed, such practices can, in certain circumstances, increase economic deficiency and render markets more, rather than less, competitive." In Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, 203 F.3d 1028, 1035 (8th Cir. 2000), cert. denied, 531 U.S. 815 (2000), the Eighth Circuit held that communications between competitors described as the exchange of "price verification information" was too ambiguous to support an inference of an illegal price-fixing agreement. "Generally speaking, competitors may exchange price information for legitimate business reasons." In re Brand Name Prescription Drugs Antitrust Litig., 1999 WL 1024547, at *4 (N.D. Ill. Nov. 5, 1999), cert denied, 528 U.S. 1181 (2000). For example, competitors may have a legitimate business reason to confirm or verify current pricing to ensure their prices are competitive. Id. Gathering a competitors' price information can be consistent with independent competitive behavior. Stephen Jay Photography, Ltd. v. Olan Mills, Inc., 903 F.2d 988, 996 (4th Cir. 1990) ("The fact that the price information about one company is found in a competitor's files or an employee reports a competitors pricing policy to his home office and the two companies charge similar prices for their products, without more, cannot support an inference [of conspiracy]); Rosefielde v. Falcon Jet Corp., 701 F. Supp. 1053, 1061 (D.N.J. 1988) ("[T]he mere showing of an exchange of price information among competitors, without more, is insufficient to establish a violation of the antitrust laws.")

Accordingly, Plaintiffs' factual allegation that VandeBrake and Stewart "discussed prices" beginning in 2006 is not sufficient from which to draw a reasonable inference that there was any illegal price-fixing agreement between Alliance Concrete, Inc. n/k/a VS Holding and Great Lakes prior to 2008, or any time for that matter.

> **B.     Alleging a single parallel price change does not make a pre-2008 price-fixing agreement between Alliance Concrete and Great Lakes plausible**

Plaintiffs' allege that in 2007, "Great Lakes and GCC each increased its sheet price by the same increment as the other." (SACC ¶120) This does not allege anything about VS Holding's predecessor Alliance Concrete, Inc. Even if it had, that still would allege nothing more than a single parallel price change in 2007 (and nothing at all for 2006) insufficient to reasonably infer the existence of an illegal price-fixing agreement during the years 2006 and 2007 involving Alliance Concrete, Inc.

In Blomkest Fertilizer, Inc. v. Potash Corp., 203 F.3d 1028 (8th Cir. 2000), cert. denied, 531 U.S. 815 (2000), the Eighth Circuit considered the quality of parallel pricing evidence as proof of an illegal price-fixing agreement in the potash industry. The court held that roughly equivalent pricing among competitors or a "follow the leader" approach to pricing changes only establishes that the producers consciously paralleled each other's prices, not that they have entered into an illegal agreement to fix prices. Id. at 1032. As the court stated: "Conscious parallelism is the process 'not in itself unlawful, but which forms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests.'" Id. (citing Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227 (1993)). "Particularly when the product in question is fungible . . . courts have noted that parallel pricing lacks probative significance." Id. at 1033.

Plaintiffs have failed to sufficiently allege any "plus factors" that would allow this Court to properly infer a price-fixing agreement from the alleged consciously parallel price change back in 2007. Id. Plaintiffs' Second Amended Complaint thus fails to plead sufficient facts to

make plausible the existence of a price-fixing agreement between Alliance Concrete, Inc. and Great Lakes at that time

### C. The complaint also fails to allege facts from which to infer the existence of a pre-2008 agreement to allocate territory between Alliance Concrete and Great Lakes

Plaintiffs' proposed amended complaint acknowledges that the only alleged bid-rigging occurred in 2008 and 2009. (SACC ¶¶149–151). Plaintiffs do attempt to assert an agreement to allocate territory as part of "The GCC/Great Lakes Conspiracy", but fail to allege facts from which to infer that such an agreement existed prior to 2008, if ever. Plaintiffs' allege that the delivery territories of several of the plants of Great Lakes and GCC substantially overlap. (SACC ¶125). However, the complaint does not allege facts indicating <u>when</u> such alleged overlap first developed. No facts are alleged to support that Alliance Concrete and Great Lakes had the capability to operate in each other's "back yard" throughout 2006 and 2007, given the practical constraints on the delivery distance for concrete. Plaintiffs then try to use their insufficient allegations of a pre-2008 price-fixing agreement to support an equally speculative pre-2008 territorial allocation agreement. (SACC ¶126). Plaintiff's implausible allegations of different antitrust conspiracies do not improve by trying to support one speculative agreement with another.

Plaintiffs' allegations also rely upon the frequent use of an indefinite time reference, such as "during" or "through" the period 2006 to 2009.[4] Attempting to hang a pre-2008 illegal agreement involving Alliance Concrete on the conclusory word "through", without any factual detail at all, is insufficient to satisfy the pleading standard under <u>Twombly</u>, 550 U.S. 544, 555

---

[4] E.g., plaintiffs' allege that the illegal agreements were in existence "from before 2006 through at least 2009," ¶113; "from before 2006 through at least 2009 . . .," ¶114; "Beginning in 2006 and continuing through 2009", ¶115.

9

(2007). The term "throughout", or similar term like "during", is an ambiguous word that can mean either "every part of" or just "here and therein." Work Connection, Inc. v. Bui, 749 N.W.2d 63, 68–69 (Minn. App. 2008). The Supreme Court in Twombly was critical of this type of broad brush allegation as to time: "Apart from identifying the seven year stand which the Section 1 violations were supposed to have occurred . . ., the pleadings mention no specific time, place or person involved in the alleged conspiracies." Id. at 564, n.10. Courts have held that just alleging a broad time period, without specifics, is not sufficient to state a claim. In re Urethane Antitrust Litig., 663 F. Supp. 2d 1067, 1077 (D. Kan. 2009) (price-fixing complaint dismissed due to lack of specifics as to time because under Twombly, "plaintiffs' cannot simply allege a conspiracy beginning at a particular time; rather, they must allege facts to support the existence of a conspiracy during the entire period"). PSKS, Inc. v. Leegin Creative Leather Prods., Inc., 2009 WL 938561, at *8 (E.D. Tex. Apr. 6, 2009), affirmed, 615 F.3d 412 (5th Cir. 2010), cert. denied, 2011 WL 588920 (U.S. Feb. 22, 2011) (Under Twombly, court rejected antitrust claim "because the horizontal conspiracy was alleged without the level of detail -- the who, what, when, and how"). The court in Twombly assumed the truth of the allegation that the Defendant involved there had entered into a legal agreement during or throughout a significant period of time, but the court still found such an allegation furnished "no clue as to . . . when and where the illicit agreement took place." Id. at 564, n.10. The same is true here with respect to any alleged pre-2008 territorial allocation agreement.

Plaintiffs' then allege in support of their pre-2008 territorial allocation allegation that, because Stewart told two of his competitors to stay out of his territory (one time alleged in 2007 to Steve VandeBrake; the other at an unspecified date), or should infer that an agreement allocating territory between Alliance and Great Lakes "already existed before 2007." (SACC

¶128). However, Stewart's conduct in warning competitors out of his area does not raise a reasonable inference that there was a pre-existing agreement between the competitors to divide the territory. Such conduct is just as consistent with a natural and innocent tendency of any business owner to protect their primary market area from encroachment by competitors. Such ambiguous conduct is not sufficient to support a plausible claim of a pre-2008 territorial allocation agreement.

Significantly, the only time Plaintiffs get near to making a specific allegation of an express agreement between Stewart and VandeBrake to allocate territories, <u>they put no date on it whatsoever</u> (SACC ¶129).[5] Plaintiffs' allegations regarding VandeBrake's admissions to federal investigators of a "territorial understanding" with Great Lakes is similarly devoid of any specific time period (SACC ¶130). Obviously, such "floating" admissions of an agreement without any specific reference to time are not sufficient from which to infer the existence of the agreement at any time <u>other than at or about the admission was made</u>, which was long after the asset sale to GCC.

Perhaps aware of the lack of any time anchor for this alleged territorial allocation agreement, Plaintiffs' seize on Stewart's apparent reference to his company's "'historic areas'" (SACC ¶129). Plaintiffs then boldly assert: "The idea that such territories would be 'historic' supports the conclusion that territorial allocation agreements had been in place for an extended period of time." Id. Of course, it would not be at all suspicious for companies to have "historically" operated primarily in certain markets without any territorial allocation agreement. This is particularly true in the ready-mix business, where Plaintiffs' own proposed pleading

---

[5] "In statements to federal investigators, Defendant Stewart admitted that he and Defendant VandeBrake had an agreement concerning the geographic area in which their respective companies would deliver Ready-Mix Concrete, and that the two agreed to stay out of each other's back yards and stay in their respective, 'historic area.'" (SACC ¶129).

11

admits that ready-mix plants can only operate in a limited territory because the product is perishable. (SACC ¶¶72–77). While such a pre-existing and legal tendency of one company to primarily do business in a certain area could be the precursor to a later formal territorial allocation agreement, such tendency in no way reasonably suggests an illegal agreement.

In In re Florida Cement and Concrete Antitrust Litig., 2010 WL 4136306, at *13 (S.D. Fla. Oct. 12, 2010), the plaintiffs alleged illegal market allocation agreement among the suppliers of ready-mix concrete in Florida. The plaintiffs alleged a number of instances where one defendant chose not to compete for another defendant's customer or one defendant would offer a non-competitive price to provide cement or concrete to a customer in an area dominated by another defendant. The court commented on these allegations:

> For the most part, although not uniformly, these actions resemble the conscious parallel decisions not to compete alleged in Twombly, which the Supreme Court found to be "so natural" and inadequate to support a plausible inference of an unlawful agreement. 550 U.S. at 556, 127 S. Ct. 1955 ("[I]f alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a Section 1 violation against almost any group of competing businesses would be a sure thing.")
> 
> [Court cites and discusses specific alleged examples where companies in concrete market allocated customers].
> 
> While these are not the only examples alleged by Plaintiffs where Defendants refused to compete for each other customers, they are typical. They are also consistent with legitimate, competitive business behavior in a concentrated market. As was the case in Twombly, each defendant in this case had a reason for its "competitive reticence". 550 U.S. at 567, 127 S. Ct. 1955; Defendants knew aggressively competing for another defendant's customers would elicit a response – that is, they "surely knew the adage about him who lives by the sword," Id. at 568, 127 S. Ct. 1955). Consequently, the alleged unlawful agreement is not the most plausible explanation for defendants parallel decisions not to compete for each other's customer.

Id. at *14–15

The same is true here. Plaintiffs' have failed to allege sufficient facts to demonstrate a plausible claim based upon any territorial allocation agreement between Alliance Concrete and Great Lakes, if ever.

### IV.  PLAINTIFFS HAVE NOT PLED SUFFICIENT FACTS TO PLAUSIBLY SUGGEST VS HOLDING INVOLVEMENT IN "THE GCC/SIOUXLAND CONSPIRACY"

Plaintiffs have made allegations in support of a third alleged conspiracy, which they have labeled "The GCC/Siouxland Conspiracy" (SACC ¶¶136–153). Yet not a single specific factual allegation in that portion of the proposed amended complaint supports any reasonable inference that VS Holding was involved to any degree in any illegal agreement with Defendant Siouxland. The earliest date to which Plaintiffs tie <u>any</u> nefarious conduct involving Siouxland is June 2008, when Plaintiffs allege Douglas Patrick, General Manager of Siouxland, "began engaging in meetings and discussions with Defendant VandeBrake [then sales manager for GCCA] concerning the prices that their respective companies would charge for ready-mix concrete, and reached specific agreements setting such prices" (SACC ¶139). Other specific allegations included in the amended complaint in support of this conspiracy only reference 2009. The only reference of any sort to a date earlier than 2008 is the quotation in paragraph 141 from an electronic calendar entry by VandeBrake that actually supports the reasonable inference that there were <u>no</u> illegal agreements between VS Holding and Siouxland in 2007. Plaintiffs allege that VandeBrake in that entry stated in part: "'07' there was <u>no price-fixing</u> because [CW-1 Patrick] wanted to run or make Mark J. tell Sell out!" (SACC ¶141 (emphasis added)). Confirming that the alleged conspiracy involving VandeBrake and Siouxland was not formed until after VS Holding's sale of its entire business to GCCA, Plaintiffs allege that the

"GCC/Siouxland Class" is composed of purchasers during a period of time "from July 1, 2009 through December 31, 2009." (SACC ¶195).

Given the clarity of Plaintiffs' own proposed pleading as to the time period for the alleged "GCC/Siouxland Conspiracy", we are perplexed as to why Plaintiffs propose to include VS Holding among the defendants involved. Nowhere is it alleged that Steve VandeBrake was acting on behalf of VS Holding in his ready-mix work in 2008 and 2009, or that VS Holding profited even one penny from GCCA's or Siouxland's sales in these years. This illustrates the precise problem addressed in GCCA's resistance to Plaintiffs' motion to amend (in which VS Holding joins) -- Plaintiffs have responded to this Court's dismissal of an allegation of one "overarching conspiracy" by re-pleading the case as three conspiracies that are so "overlapping" as to create joint and several liability of all conspirators in all conspiracies at all times. That is just a word game, a distinction without a difference.

Count III of Plaintiffs' proposed Second Amended Complaint fails to even begin to state a claim against VS Holding, and therefore, granting Plaintiffs' motion to amend to assert the proposed Count III against VS Holding would be futile and should be denied.

## CONCLUSION

VS Holding Company respectfully requests that the Court deny Plaintiffs' Motion for Leave to File Second Amended Consolidated Class Action Complaint for all the reasons set forth in the Resistance to that motion filed by GCCA, and for the additional reasons set forth in this brief.

| | |
|---|---|
| Daniel L. Hartnett | /s/ HAYWARD L. DRAPER |
| Marci L. Iseminger | /s/ THOMAS H. WALTON |
| CRARY, HUFF, INKSTER, SHEEHAN, | NYEMASTER, GOODE, P.C. |
| RINGGENBERG, HARTNETT & STORM, | 700 Walnut Street, Suite 1600 |

P.C.
614 Pierce, P.O. Box 27
Sioux City, IA 51102
Telephone: (712) 277-4561
Facsimile: (712) 277-4605 or 712-244-4532
email: dhartnett@craryhuff.com
ATTORNEYS FOR DEFENDANT
VS HOLDING COMPANY

Des Moines, IA  50309-3899
Telephone:   (515) 283-3100
Facsimile:   (515) 283-3108
Email: hdraper@nyemaster.com
        thwalton@nyemaster.com
ATTORNEYS FOR DEFENDANT
VS HOLDING COMPANY

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2011, I presented the foregoing to the Clerk of the Court for filing and uploading into the ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's ECF system.

/s/ THOMAS H. WALTON
NYEMASTER, GOODE, WEST,
HANSELL & O'BRIEN, P.C.
700 Walnut Street, Suite 1600
Des Moines, IA  50309-3899
Telephone:  (515) 283-3100
Facsimile:  (515) 283-3108
Email: hdraper@nyemaster.com

418089_1