**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

| | |
|---|---|
| **IN RE: IOWA READY-MIX CONCRETE ANTITRUST LITIGATION** | **No. C10-4038-MWB (CONSOLIDATED CASES)** |

**DECLARATION OF IRWIN B. LEVIN**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR AN AWARD**
**OF ATTORNEYS' FEES, THE REIMBURSEMENT OF EXPENSES,**
**AND INCENTIVE AWARDS FOR CLASS REPRESENTATIVES**

The undersigned, Irwin B. Levin, declares and states as follows:

1.      I am the Managing Partner of the law firm of Cohen & Malad, LLP.  I have been appointed, together with attorney Gregory P. Hansel of Preti, Flaherty, Beliveau & Pachios, LLP, as Interim Co-Lead Counsel in the above-captioned case, and as Settlement Class Counsel for the three Settlement Classes certified by the Court.  I have substantial experience in class action and complex litigation, including antitrust matters.  I submit this Declaration in support of the Plaintiffs' Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Incentive Awards for Class Representatives (the "Motion").

2.      In support of the Motion, I incorporate and restate herein my Declaration in Support of Preliminary Approval of Settlement Agreements and Preliminary Certification of Settlement Classes.

3.      Under the three Settlement Agreements preliminarily approved by the Court on July 20, 2011, the Defendants have agreed to pay the combined sum of $18.5 million, an amount well in excess of the actual damages estimated by the Plaintiffs' expert to have been sustained by class members as a consequence of Defendants' antitrust conspiracies.  Having achieved this result

efficiently and promptly, despite vigorous and skillful opposition by Defendants' counsel, Class

Counsel have now moved the Court to approve as their reasonable attorneys' fees one-third of

the amount of each of the Settlement Funds established under the three Settlement Agreements

($6,166,667).  Class Counsel also request that the Court authorize reimbursement of their

litigation expenses out of the Settlement Funds ($911,445.92), and the payment of an incentive

award in the amount of $10,000 to each Class Representative for their service on behalf of the

Classes.

4.     The first complaint in this litigation was filed on the same day as Defendant

Steven VandeBrake's May 4, 2010 entry of a guilty plea to violations of Section One of the

Sherman Act, 15 U.S.C. § 1, pursuant to a plea agreement with the United States Department of

Justice ("DOJ").  The VandeBrake guilty plea was followed by a guilty plea by Kent Stewart on

May 24, 2010, and a guilty plea by Chad Van Zee on December 6, 2010.  Defendant Siouxland

Concrete admitted criminal liability pursuant to the DOJ Antitrust Division's corporate leniency

policy, and is the "antitrust leniency applicant" pursuant to § 213 of the Antitrust Criminal

Penalty Enhancement and Reform Act of 2004 ("ACPERA"), P.L. 108-237, 118 Stat. 666, 15

U.S.C. note.  After the parties reached settlements in principle in this case, the remaining

corporate Defendants – GCC Alliance, Inc., VS Holding, Inc. and Great Lakes Concrete, Inc. –

also entered into plea agreements with the DOJ and admitted to Sherman Act violations.

5.     Despite the eventual admission to criminal antitrust violations by virtually all of

the individual and corporate Defendants, no Defendant ever conceded the appropriateness of

class-wide relief or even liability for antitrust damages in the civil case.  Instead – with the

exception of leniency applicant Siouxland Concrete – the Defendants sought to have the civil

claims dismissed, challenged the Plaintiffs' efforts to secure class certification, and consistently

sought to portray the geographic, temporal and monetary reach of their conspiracies as highly limited.  The effort and expense required to prosecute the civil claims to a meaningful conclusion have therefore been substantial, but are justified by the Settlement benefits now available to Settlement Class members.

6.     After the VandeBrake guilty plea, in May 2010, other direct purchasers of RMC from the Defendant companies began filing civil actions seeking class action status and damages for the overcharges caused by the Defendants' conspiracies to fix prices, rig bids and allocate territories in northwest Iowa.  In June 2010 the Court consolidated the first ten such cases under the foregoing caption.  An additional four cases were later added.

7.     In July 2010 the Court appointed the undersigned as Interim Co-Lead Plaintiffs' Counsel.[1]  Following this appointment, Class Counsel worked with opposing counsel and Magistrate Zoss to reach an agreed scheduling order and a negotiated protective order concerning confidentiality.  Class Counsel further met with or communicated with other Plaintiffs' counsel regarding any relevant information available to them and their clients, reviewed information regarding other possible additional named Plaintiffs, interviewed existing named Plaintiffs and certain class members, and prepared and filed an initial Consolidated Class Action Complaint.  (Dkt. 104).  Class Counsel also prepared and served initial disclosures, served initial discovery requests upon Defendants, and continued their factual investigation of the conspiracies and related information.

8.     Class Counsel also began a series of meetings and interviews with Siouxland Concrete, its counsel and its current and former employees.  These meetings occurred pursuant to Siouxland's role as the "leniency applicant" under ACPERA.  Under the Act, Siouxland and its

---

[1] Interim Co-Lead Counsel have now been appointed Settlement Class Counsel, and are referred to herein simply as "Class Counsel."

employees were required to cooperate with civil plaintiffs and their counsel in order to receive

the benefit of limited liability (single damages and no joint and several liability) in the civil

action.  Class Counsel made every effort to maximize the cooperation provided by Siouxland, as

well as by former Siouxland employees.  These efforts resulted in information related to the three

conspiracies and their participants, the characteristics of and participants in the relevant

geographic and product markets, and the common methods and practices of manufacturing,

marketing and selling RMC.  These efforts also assisted in Class Counsel's conduct of further

discovery.

       9.     Class Counsel also engaged in substantial traditional discovery.  Each of the

named parties, including the named Plaintiffs, has responded to interrogatories and requests for

production of documents.  Not surprisingly, the responses to written discovery led to further

conferences and communications among all counsel regarding the appropriate scope of discovery

in the case.  The named Plaintiffs responded to Interrogatories and produced a substantial

volume of documentary evidence related to their purchases of RMC from Defendants.  Over

several months, Class Counsel also obtained, organized and reviewed nearly 60,000 pages of

documents from the Defendants, including internal financial, transactional and operational

documents, as well as materials related to or produced during the ongoing criminal proceedings.

       10.    Significant time and effort was also directed to the acquisition of transactional

data from each of the Defendants.  The data sought by Class Counsel related not only to the

identity of class members and total sales of RMC, but also to other factors relevant to class wide

impact and damages, such as demand, delivery times and locations, product manufacturing,

pricing, and product identification.  The effort to secure this data from all Defendants – despite a

wide variety of operating systems, data types, and data retention policies – lasted over several

months.  It required the employment of consultants and technical assistants, the input and assistance of program manufacturers, and the assistance of Magistrate Zoss.  The effort was successful, in that it resulted in a robust database from which the Plaintiffs' expert was able to isolate and measure impact and damages for each of the Settlement Classes.

11.     Class Counsel have also reviewed and analyzed the extensive record created in the criminal proceedings.  This record includes information and documents generated by the Federal Bureau of Investigation ("FBI"), the United States Department of Transportation, and the DOJ, such as witness interviews, investigative summaries, phone records, personal financial records and calendars.  It also includes extensive transcripts of testimony provided during the criminal sentencing hearings for Defendants VandeBrake and Stewart.  Class Counsel monitored the criminal proceedings closely throughout the litigation in order to obtain any relevant information that was made available.

12.     Class Counsel also obtained deposition testimony from twelve individuals and corporate designees.  Deposition testimony included extensively detailed testimony from Defendant employees and officers regarding topics such as the geographic and product markets for RMC, participants and competitors in and around the geographic markets, common RMC product categories, common methods of marketing and pricing RMC products, common industry standards for the manufacture and testing of RMC, delivery and performance aspects of RMC, internal pricing, bidding and discounting practices, and the methods of recordkeeping and accounting of Defendants.  Deposition testimony also included the statements provided by core conspiracy participants VandeBrake and Stewart concerning the history of the players and plants in the market, their personal conduct in furthering the conspiracies, and their attitudes toward competition in the market.

13.     Even as Class Counsel were continuing to take additional deposition testimony and shore up discovery, they were working closely with Russell Mangum, Ph.D. and other economists at Nathan Associates, Inc.  After assisting Class Counsel in obtaining relevant and necessary discovery and data from the Defendants, Mangum and his assistants worked closely with Class Counsel to analyze the relevant markets, competition and pricing practices as they related to known conspiratorial conduct.  In particular, Mangum and his assistants aided Class Counsel in the discrete identification of appropriate classes for certification, identifying the geographic and temporal limits of the conspiracies, the preparation of a Second Amended Consolidated Class Action Complaint ("Second Amended Complaint"), and an effective strategy for quantifying impact and damages.

14.     On March 29, 2011, Plaintiffs moved for leave to file the Second Amended Complaint, which alleged claims on behalf of three separate Classes – the Alliance/Tri-State Class, the Alliance/Great Lakes Class and the Alliance/Siouxland Class.  Each of the three Classes corresponds to one of three conspiracies also alleged, each asserts claims on behalf of a specified sub-set of Defendants, and each includes individuals and entities that directly purchased RMC from plants affected by the corresponding conspiracy during a specified Class Period.  In support of the claims and proposed classes, the Second Amended Complaint also alleges in detail the facts supporting the Defendants' antitrust violations, the nature and scope of the conspiracies themselves, and the market and product characteristics that made the conspiracies effective and resulted in class-wide damages.  Leave to file the Second Amended Complaint was granted on April 25, 2011.

15.     On April 1, 2011, two days after seeking leave to file their Second Amended Complaint, Plaintiffs filed their Motion for Class Certification ("Class Motion"), Supporting

Brief ("Class Brief") and a supporting appendix that included a declaration by Russell Mangum,

PhD. (the "Mangum Declaration").  (Dkt. 217, 218).  The Class Motion sought certification of

the three Classes described in the Second Amended Complaint.  The Class Brief includes an

extensive discussion of the Defendant companies and their interrelationships, the details of the

three conspiracies, facts supporting the efficacy and class-wide impact of the conspiracies, the

product and geographic markets for each conspiracy, and the relevant economic characteristics

of the northwest Iowa RMC market, all of which was supported by documentation included in

the Mangum Declaration.

16.     The Mangum Declaration set out a detailed description of the northwest Iowa

RMC market, the admitted and alleged conspiracies, and the Defendants' transactional data from

the proposed Class Periods.  It also contained a rigorous analysis of the impact of the

conspiracies on the members of the proposed Classes.  Based upon the evidence and data

available, Mangum was able to prepare a detailed analysis, with empirical support, measuring the

impact and damages from each of the three admitted conspiracies.  The conspiracy analyses,

class definition parameters, and class damages assessments in the Mangum Declaration formed

the basis for negotiations leading to the three Settlement Agreements, as well as the frameworks

of the Settlements themselves.

17.     In December 2010, Class Counsel engaged in preliminary settlement discussions

with counsel for the Leniency Applicant, Siouxland.  These initial discussions were not fruitful.

In March 2011  the parties agreed that with the completion of substantial discovery, and the

filing of Plaintiffs' Second Amended Complaint and Motion for Class Certification, along with

the Plaintiffs' expert's initial analysis of damages, litigation was at a suitable stage to attempt

mediation.  For this purpose, the parties engaged the services of The Honorable James M.

Rosenbaum, retired United States District Judge for the District of Minnesota, through JAMS Resolution Experts.  Judge Rosenbaum agreed to act as mediator and the parties scheduled an initial two-day session in April 2011.

18.     This mediation proved to be intense, protracted, and hard fought, but ultimately successful. Counsel for the parties, individual defendants, and class representatives participated in three full-day mediation sessions with Judge Rosenbaum in Omaha in April and May of 2011. With Judge Rosenbaum's assistance, the parties worked through a number of difficult issues concerning the scope of the claims, impact, and compensation for each of the three proposed Settlement Classes.  After these three extended mediation sessions, substantial progress was made but no agreements were reached. Nevertheless, counsel for the parties agreed to continue negotiations in an effort to determine if they could reach a compromise suitable to all.

19.     After multiple additional exchanges, settlements in principle were finally reached with relevant Defendants for each of the three Settlement Classes. To facilitate the drafting and finalization of the Settlements, the deadlines for responding to pending motions were stayed with the permission of the Court.  By agreement, Plaintiffs prepared the three initial draft Settlement Agreements (with exhibits) for review by the Defendants.  This led to another major round of disputes as the parties attempted to reduce to writing the details of protracted and difficult negotiations. This stage of negotiations was again hard-fought but cooperative.

20.     After two exchanges of draft agreements and continued discussions among counsel, certain fundamental disagreements remained.  Counsel for all parties therefore asked Magistrate Judge Zoss to act as mediator in an attempt to resolve the remaining issues. Following the submission of position statements to Judge Zoss regarding the still disputed provisions of the proposed Settlement Agreement, three additional mediation sessions were

undertaken by phone.  With the persistent efforts Judge Zoss, the parties were able to finally agree

on the terms of each of the Settlement Agreements that have recently been given preliminary

approval by the Court.

21.     The terms of these Settlement agreements are described in detail in Plaintiffs' Brief

in Support of Unopposed Motion for Preliminary Approval of Settlement Agreements and

Preliminary Certification of Settlement Classes.  (Dkt. 272).  If the proposed Settlements are

approved, their combined value will be $18.5 million.  Pursuant to the terms of the three

Settlements and the Court's Preliminary Approval Orders, Class Counsel, with the assistance of

notice and claims administrator A.B. Data, have issued direct mail notice of the Settlements to all

identifiable Class members and have published notice of the Settlements in the Sioux City

Journal and several local publications.  A hearing to consider final approval of the Settlements is

now scheduled for November 1, 2011.

22.     If the Court grants final approval of the Settlements, Class Counsel will then

begin the process of distributing Settlement payments, net of any awarded fees, expenses and

incentive payments, to members of the three Settlement Classes.  Class Counsel intend to

maximize the usefulness of transactional data obtained from the Defendants in discovery, and

minimize the effort required of Class members, by providing Settlement Class members with

Claim Forms that already include known RMC purchase information.  Class members will have

the opportunity to provide documentation of additional or different relevant RMC purchases to

the claims administrator.  After the close of the claims period, the claims administrator will then

distribute the net Settlement Funds to members of each Settlement Class in proportion to the

amount of their qualifying purchases of RMC as compared to all qualifying purchases (for which

valid claims are submitted).

23.     The three Settlements represent a highly favorable result for direct purchasers who paid artificially inflated prices for RMC as a result of the conspiracies.  Each settlement will enable the respective settlement class members to recover the full amount of the overcharge calculated by Dr. Mangum for each conspiracy *after* payment from each settlement fund of the allocated expenses of the litigation, the incentive awards for class representatives, and the attorneys fees that are the subject of this Motion, if such payments are approved by the Court. Class Counsel respectfully suggest that this result, achieved efficiently and in a remarkably short time given the potential complexities of the litigation, support the award of attorneys' fees and reimbursement of expenses now requested.

24.     Class Counsel's efforts in litigating this case to a successful resolution include extensive investigation and discovery, as nearly 60,000 pages of documents (including internal financial, transactional and operational documents) were obtained from the Defendants, organized, and reviewed.  Class Counsel took 12 individual and corporate designee depositions, engaged in several conferences with counsel for the Leniency Applicant, Siouxland, and interviewed current and former Siouxland employees about the details of the Alliance/ Siouxland conspiracy and the characteristics of the RMC market.  Class Counsel also obtained (with the assistance of the Court) and carefully reviewed the voluminous record of documents and testimony from the federal criminal investigation and sentencing proceedings.

25.     Class Counsel have also engaged in extensive motion practice, having briefed responses to Defendants' initial motions to dismiss, Plaintiffs' motion for leave to file a Second Amended Complaint, and Plaintiffs' Motion for Class Certification.  Further, Class Counsel engaged in motion practice and related proceedings under the supervision of Magistrate Judge

Zoss related to the discovery process, including a prolonged and difficult process of acquiring extensive data collections from all company Defendants.

26.     Class Counsel spent considerable time working closely with several experts to advance the litigation expeditiously.  In addition to the extensive work with Russell Mangum and his supporting staff, Class Counsel worked with at least one independent technical consultant to aid in the process of copying and transferring data from certain Defendants' facilities.  In support of the discovery process and subsequent class certification briefing, Plaintiffs also retained an industry expert to advise them on the structure and logistics of the RMC industry and the dynamics of the RMC market.

27.     Class Counsel have also devoted substantial time and energy to the settlement process.  These efforts included initial settlement discussions with Leniency Application Siouxland in December 2010; three full-day mediation sessions in the Spring of 2011 with Judge Rosenbaum; and three telephonic mediation sessions with Judge Zoss, all of which ultimately resulted in the resolution of heavily disputed issues and the execution of the Settlement Agreements that have been given preliminary approval by the Court.  These settlement negotiations were intense, contentious, and required substantial ingenuity on the part of all counsel to overcome multiple issues that were unique to each class.

28.     In a relatively brief length of time, Class Counsel advanced every major aspect of the litigation on the assumption that the case would proceed to trial, on behalf of three distinct Classes, and positioned the claims of Class members for a successful settlement effort. Accomplishing this result required, on several occasions, the full-time commitment of several attorneys and staff members, and at all times required the persistent effort of Class Counsel to

prevent any slowing down of the process.  The time and labor required by Class Counsel and supporting firms was therefore substantial.

29.     Plaintiffs persevered despite a substantial setback to their case when the original Consolidated Complaint was dismissed.  In response, Plaintiffs refined their claims on behalf of three completely separate classes to track the three conspiracies to which the Defendants had pleaded guilty or otherwise confessed.  Though required by the developing facts of the case, this process multiplied the complexity of the litigation.  Class Counsel were required to marshal and reevaluate the evidence to support revamped revised pleading and to establish for purposes of class certification the essential economic foundation necessary to demonstrate common impact and damages for each of the newly-alleged classes.  This process also required a complex, plant-by-plant analysis of Defendants' sales data, the competitive impact of each conspiracy on sales from each plant involved in the conspiracy, and the ultimate impact on and overcharge damages of each proposed Class.

30.     Class Counsel also had to rebut contentions by Defendants that no direct purchaser of RMC could have been harmed by any of the price-fixing, bid-rigging and market allocation agreements alleged by Plaintiffs.  For example, Defendants asserted that they constantly faced vigorous competition from other RMC producers in their individual market areas and that the existence of these competitors nullified the impact of the conspiracies.  Defendants further claimed that potential competitors in the form of portable RMC plants were regularly transported into their market to take work from them, and that substitute products such as asphalt also effectively prohibited them from raising their prices to supra-competitive levels.  Class Counsel also had to contend with multiple arguments by Defendants that even if there were agreements among them, they related only to bidding on a very limited number of jobs, not to

their prices in general, and that even these limited agreements required the agreed low bidder to offer a so-called "fair" price that resulted in no damage to the buyer.

31.     Class Counsel have represented Plaintiffs in this litigation on a contingent fee basis, anticipating no fee or reimbursement of expenses unless they achieved success for the Classes. Despite the criminal guilty pleas entered by many of the Defendants, the risk of non-recovery (or nominal recovery) remained substantial.  The risks Class Counsel faced in pursuing this case are evidenced most obviously by the successful motion to dismiss filed by Defendants.

32.     Moreover, the ability to prove antitrust impact and damages on a class-wide basis remained one of the most daunting aspects of this case. Because of the intense nature of price-fixing class actions, in which even defendants who have admitted liability vigorously contest the scope and impact of any admissions, Class Counsel were required to gather evidence, seek and maintain certification of one or more cohesive classes, establish the nature and scope of class damages, and develop trial strategies to prove their case to a jury, just as if no admissions had been made by any Defendant.

33.     To prove that the conspiracies "worked" – despite the ubiquitous conspirators' claim to the contrary – and that direct purchasers were damaged, Class Counsel were required to retain at their own expense economic experts who were not only highly skilled in their field but who were also extensively supported by researchers and analysts.  Class Counsel were also required to obtain, review and analyze thousands of pages of documents and organize and maintain these materials in computer-supported databases that make relevant information available as and when needed.  More importantly, Class Counsel were required to obtain and harmonize complex data sets from each Defendant company, in order to support an analysis of impact and damages for three distinct classes.

34.     The attorney and supporting staff time, and the substantial cost of experts, consultants and litigation support systems required to accomplish these ends, were incurred by Class Counsel with no certainty that they will ever be recovered.  Indeed, for the past year and more Class Counsel devoted very substantial amounts of their time and energy seeking to successfully prosecute this case within the strict deadlines mandated by the pretrial scheduling order and with the intent that this case would be trial ready in the spring of 2012.  All the while, substantial risks existed with respect to Plaintiffs' ability to prove their damages to a jury in the face of the conflicting estimates that were sure to be offered by Defendants' experts.

35.     Moreover, even if Plaintiffs had surmounted these obstacles, obtained class certification, and won sizable judgments, collecting such judgments from Defendants would have posed additional challenges.  An interlocutory appeal from class certification would likely have been sought pursuant to Rule 23(f), and an appeal from any subsequent judgment for the Plaintiff Classes was a certainty.   Moreover, Class Counsel learned in the course of litigating this case that real concerns existed as to whether all of the Defendants would be able to pay a large judgment.  Some Defendants are modest-sized family-owned businesses with used industrial equipment as their primary assets and outstanding debts for which that equipment already serves as collateral.  Other Defendants, while ostensibly large, are comprised of different corporate entities with varying abilities to pay, which could have presented challenging veil-piercing issues and which may have held substantial assets abroad.

36.     Class Counsel have obtained an excellent result for the Class in this case.  If the proposed Settlements are approved, their combined value of $18.5 million is enough for members of each proposed Settlement Class to recover the full value of their actual damages, as estimated by Plaintiffs' expert, even if the Court decides to award the request attorneys' fees,

expenses, and incentives awards.  This outcome is all the more impressive when juxtaposed with the estimate by the U.S. Department of Justice, as stated in the VandeBrake Presentence Report, that the total volume of commerce affected by the conspiracies was just $5,666,348.61.  In other words, Class Counsel recovered *overcharge damages* for the Classes in a sum more than three times greater than DOJ's own estimate of the *total volume of commerce affected* by the conspiracy.

37.     Given the obstacles Plaintiffs would have faced if the case had not settled, Class Counsel believe the result obtained measures up very well indeed.  It is also notable that Class Counsel achieved this excellent result after just a year of litigation.  To achieve this rapid resolution, Class Counsel front-loaded their efforts and investment, putting the case – with the Court's assistance – on a fast track toward trial.  The successful mediation was conducted without delay once Plaintiffs had achieved a sufficient understanding of the factual underpinnings of their case to put them in a solid negotiating position and to ensure that settlement would advance the interests of the Classes.

38.     During the course of this litigation, Class Counsel has collected monthly time and expense reports from each of the law firms performing legal services on behalf of the Plaintiffs and the Class.  Time has been reported by each firm for each of the following categories of services:  (1) investigations, factual and legal research, (2) discovery, document management and depositions, (3) pleadings, briefs and pretrial motions, (4) court appearances, (5) settlement, (6) litigation strategy and analysis, (7) class certification, (8) trial preparation and trial, (9) case management and administration, and (10) third party communication.  Only time for services performed at the direction of Class Counsel was to be reported.

39.     According to the monthly time reports submitted by each law firm over the course
of the litigation, including Class Counsel, the total number of hours expended on this litigation
by all counsel representing Plaintiffs and the Class from inception through July 31, 2011 is
12,171.90 hours.   The total lodestar, based on each firm's reported time and billing rates, is
$4,933,057.25.  The hourly rates for the attorneys and professional support staff representing
Plaintiffs and the Class are the same as the usual and customary hourly rates charged for their
services in similar complex class action litigation.

40.     The expense reports submitted by each law firm to the undersigned were prepared
from expense vouchers, check records, and similar source material and represent an accurate
recordation of expenses incurred.  Expenses were reported in the following categories:
commercial and internal copy charges, court fees, court reporters and transcripts, computer
research, telephone, fax and email, postage and express delivery, professional fees, witness and
service fees, travel and lodging, and clerical overtime.

41.     According to the expense reports submitted by each law firm over the course of
the litigation, including Class Counsel, Plaintiff and Class counsel have collectively incurred a
total of $911,445.92 in litigation-related expenses through July 31, 2011 in connection with the
prosecution of this litigation. The most substantial expenses fall into three types: (i) experts,
consultants and data management ($682,505.66); (ii) document hosting and technical support
($19,134.37); and (iii) mediation services ($19,142.69).

42.     Each of the named Plaintiffs made a most important contribution to the litigation,
by stepping forward on behalf of others to remedy a wrong in a relatively tight-knit industry.  As
members of the proposed Plaintiff Classes, the named Plaintiffs could have simply awaited the
outcome of the litigation and received the same benefits as any other class member.  Instead,

16

they committed to participate actively in what promised to be a lengthy and hard fought lawsuit against their corporate suppliers on behalf of a large group of potential class members.  From the beginning, the named Plaintiffs have been made aware that an incentive fee is not a foregone conclusion but was a possibility, and would be left to the Court's discretion.  Now that a substantial interim recovery has been made for the Settlement Classes, however, the Plaintiffs' valuable services and commitment to date should be recognized.

43.     The named Plaintiffs in this case, Randy Waterman, Frank Audino Construction, Inc., Sioux City Engineering Co., the City of Le Mars, Iowa, Holtze Construction Company and Brown Commercial Construction, Inc. have each made substantial contributions on behalf of Settlement Class members.  Each Plaintiff, through one or more representatives, has participated in multiple in-person and/or telephone conferences, including extensive meetings to prepare discovery responses.  Each Plaintiff has provided answers to interrogatories, has reviewed their current and archived records, has produced documents responsive to requests, and has allowed Class Counsel's consultants to access their computer systems and servers and download data for production.  Some of the Plaintiffs have conferenced by phone with the Plaintiffs' expert, and at least two appeared personally during the mediation process.

44.     Because each Plaintiff has provided invaluable assistance and demonstrated an ongoing commitment to protecting the interests of Class members, Class Counsel believe that the requested incentive award of $10,000 for each Plaintiff is reasonable under the circumstances of this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.


September 2, 2011                          /s/ Irwin B. Levin
Date                                       Irwin B. Levin

Respectfully submitted,


*/s/ Irwin B. Levin*                       */s/ Gregory P. Hansel (by consent)*
Irwin B. Levin                             Gregory P. Hansel
Scott D. Gilchrist                         Randall B. Weill
COHEN AND MALAD, LLP                       Joshua R. Carver
One Indiana Square, Suite 1400             PRETI, FLAHERTY, BELIVEAU  &
Indianapolis, IN  46204                    PACHIOS, LLP
Telephone: (317) 636-6481                  One City Center
Facsimile: (317) 636-2593                  P.O. Box 9546
ilevin@cohenandmalad.com                   Portland, ME  04112-9546
sgilchrist@cohenandmalad.com               Telephone: (207) 791-3000
                                           Facsimile: (207) 791-3111
                                           ghansel@preti.com
                                           rweill@preti.com
                                           jcarver@preti.com


**Interim Co-Lead Counsel**                **Interim Co-Lead Counsel**


Mark L. Zaiger
Jennifer E. Rinden
SHUTTLEWORTH & INGERSOLL, P.L.C.
115 Third Street SE, Suite 500
P.O. Box 2107
Cedar Rapids, IA  52406-2107
Telephone: (319) 365-9461
Facsimile: (319) 365-8564
MLZ@ShuttleworthLaw.com
JER@ShuttleworthLaw.com


**Plaintiffs' Liaison Counsel**

## CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2011, the attached document was electronically transmitted to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to all registered counsel of record.

/s/ *Irwin B. Levin*
Irwin B. Levin
COHEN AND MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN  46204
Telephone: (317) 636-6481
Facsimile: (317) 636-2593
ilevin@cohenandmalad.com