## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

| | |
|---|---|
| IN RE: IOWA READY-MIX CONCRETE ANTITRUST LITIGATION | No. C10-4038-MWB (CONSOLIDATED CASES) |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES, THE REIMBURSEMENT OF EXPENSES, AND INCENTIVE AWARDS FOR CLASS REPRESENTATIVES**

## I.    INTRODUCTION

Under the three Settlement Agreements[1] preliminarily approved by the Court on July 20, 2011, the Defendants have agreed to pay the combined sum of $18.5 million, an amount well in excess of the actual damages estimated by the Plaintiffs' expert to have been sustained by class members as a consequence of Defendants' antitrust conspiracies.  Declaration of Irwin B. Levin in Support of Unopposed Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Incentive Awards for Class Representatives ("Levin Dec.") ¶3.[2]  Having achieved this result efficiently and promptly, despite vigorous and skillful opposition by Defendants' counsel, Class

---

[1] The Settlements include: (i) the Settlement Agreement with Tri-State Ready Mix, Inc., VS Holding Company, f/k/a Alliance Concrete, Inc., GCC Alliance Concrete, Inc., Chad Van Zee and Steven Keith VandeBrake ("Alliance/Tri-State Settlement"), which resolves the claims of a proposed direct purchaser Alliance/Tri-State Settlement Class in exchange for payments by Alliance/Tri-State Settling Defendants in the combined amount of $10,730,335; (ii) the Settlement Agreement with Great Lakes Concrete, Inc., VS Holding Company, f/k/a Alliance Concrete, Inc., GCC Alliance Concrete, Inc., Kent Robert Stewart and Steven Keith VandeBrake ("Alliance/Great Lakes Settlement"), which resolves the claims of a proposed direct purchaser Alliance/Great Lakes Settlement Class in exchange for payments by Alliance/Great Lakes Settling Defendants in the combined amount of $5,121,412; and (iii) the Settlement Agreement with Siouxland Concrete Company, VS Holding Company, f/k/a Alliance Concrete, Inc., GCC Alliance Concrete, Inc. and Steven Keith VandeBrake ("Alliance/Siouxland Settlement"), which resolves the claims of a proposed direct purchaser Alliance/Siouxland Settlement Class in exchange for payments by Alliance/Siouxland Settling Defendants in the combined amount of $2,648,253.

[2] The Levin Declaration affirms (and largely duplicates) portions of the instant Brief that contain factual assertions or opinions of Interim Co-Lead Counsel.

Counsel now respectfully move the Court to approve as their reasonable attorneys' fees one-third of the amount of each of the Settlement Funds established under the three Settlement Agreements ($6,166,667). *Id*. Class Counsel also request that the Court authorize reimbursement of their litigation expenses out of the Settlement Funds ($911,445.92), and the payment of an incentive award in the amount of $10,000 to each Class Representative for their service on behalf of the Classes. *Id*. If the Court awards the attorneys' fees, reimbursement of expenses and incentive fees requested by Class Counsel, members of each Settlement Class will still be poised to recover the full value of the actual damages estimated by the Plaintiffs' expert to have been sustained by them as a consequence of Defendants' unlawful conduct. *Id*. at ¶23.

## II.     HISTORY OF THE LITIGATION

### A.     Nature of the Claims

Plaintiffs have advanced claims on behalf of direct purchaser customers damaged as a result of three antitrust conspiracies involving the four largest Ready-Mix Concrete ("RMC") producers in northwest Iowa.  The Plaintiffs allege that from at least January 1, 2006 through November 2010, Defendant GCC Alliance, Inc. and its predecessor Alliance Concrete, Inc. (collectively herein "GCC") – with Defendant Steven VandeBrake in charge of sales and pricing – participated in three conspiracies: one with Defendant Tri-State Ready Mix, Inc. ("Tri-State") and its owner Chad Van Zee ("Van Zee"); one with Great Lakes Concrete, Inc. ("Great Lakes") and its owner Kent Stewart ("Stewart"); and one with Siouxland Concrete Company ("Siouxland").  Plaintiffs allege that in each instance GCC and its "competitor" entered into and engaged in a combination and conspiracy in order to suppress and eliminate competition in the market for Ready-Mix Concrete by fixing prices, rigging bids and/or allocating territories, and that each of the conspiracies caused direct purchasers of RMC to pay artificially inflated prices, in violation of Section One of the Sherman Act, 15 U.S.C. § 1.

2

The first complaint in this litigation was filed on the same day as Defendant Steven VandeBrake's May 4, 2010 entry of a guilty plea to violations of Section One of the Sherman Act, 15 U.S.C. § 1, pursuant to a plea agreement with the United States Department of Justice ("DOJ"). The VandeBrake guilty plea was followed by a guilty plea by Kent Stewart on May 24, 2010, and a guilty plea by Chad Van Zee on December 6, 2010. Defendant Siouxland Concrete admitted criminal liability pursuant to the DOJ Antitrust Division's corporate leniency policy, and is the "antitrust leniency applicant" pursuant to § 213 of the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 ("ACPERA"), P.L. 108-237, 118 Stat. 666, 15 U.S.C. note. After the parties reached settlements in principle in this case, the remaining corporate Defendants – GCC Alliance, Inc., VS Holding, Inc. and Great Lakes Concrete, Inc. – also entered into plea agreements with the DOJ and admitted to Sherman Act violations. Levin Dec. ¶4.

Despite the eventual admission to criminal antitrust violations by virtually all of the individual and corporate Defendants, no Defendant ever conceded the appropriateness of class-wide relief or even liability for antitrust damages in the civil case. Instead – with the exception of leniency applicant Siouxland Concrete – the Defendants sought to have the civil claims dismissed, challenged the Plaintiffs' efforts to secure class certification, and consistently sought to portray the geographic, temporal and monetary reach of their conspiracies as highly limited. The effort and expense required to prosecute the civil claims to a meaningful conclusion have therefore been substantial, but are justified by the Settlement benefits now available to Settlement Class members. Levin Dec. ¶5.

### B.    Class Counsel's Litigation Efforts

After the VandeBrake guilty plea, in May 2010, other direct purchasers of RMC from the Defendant companies began filing civil actions seeking class action status and damages for the

overcharges caused by the Defendants' conspiracies to fix prices, rig bids and allocate territories in northwest Iowa. In June 2010 the Court consolidated the first ten such cases under the foregoing caption. *See* Order Re Consolidation, Stay and Procedures for Selecting Interim Class Counsel. (Dkt. 24). An additional four cases were later added. (Dkt. 32, 34, 40, 81). Levin Dec. ¶6.

In July 2010 the Court appointed the undersigned, Irwin Levin of Cohen & Malad, LLP and Gregory Hansel of Preti, Flaherty, Beliveau & Pachios, LLP, as Interim Co-Lead Plaintiffs' Counsel (Dkt. 100).[3] Following this appointment, Class Counsel worked with opposing counsel and Magistrate Zoss to reach an agreed scheduling order and a negotiated protective order concerning confidentiality. Class Counsel further met with or communicated with other Plaintiffs' counsel regarding any relevant information available to them and their clients, reviewed information regarding other possible additional named Plaintiffs, interviewed existing named Plaintiffs and certain class members, and prepared and filed an initial Consolidated Class Action Complaint. (Dkt. 104). Class Counsel also prepared and served initial disclosures, served initial discovery requests upon Defendants, and continued their factual investigation of the conspiracies and related information. Levin Dec. ¶7.

In particular, Class Counsel began a series of meetings and interviews with Siouxland Concrete, its counsel and its current and former employees. These meetings occurred pursuant to Siouxland's role as the "leniency applicant" under ACPERA. Under the Act, Siouxland and its employees were required to cooperate with civil plaintiffs and their counsel in order to receive the benefit of limited liability (single damages and no joint and several liability) in the civil action. Class Counsel made every effort to maximize the cooperation provided by Siouxland, as

---

[3] Interim Co-Lead Counsel have now been appointed Settlement Class Counsel, and are referred to herein simply as "Class Counsel."

well as by former Siouxland employees.  These efforts resulted in information related to the three

conspiracies and their participants, the characteristics of and participants in the relevant

geographic and product markets, and the common methods and practices of manufacturing,

marketing and selling RMC.  These efforts also assisted in Class Counsel's conduct of further

discovery.  Levin Dec. ¶8.

Class Counsel also engaged in substantial traditional discovery.  Each of the named

parties, including the named Plaintiffs, has responded to interrogatories and requests for

production of documents.  Not surprisingly, the responses to written discovery led to further

conferences and communications among all counsel regarding the appropriate scope of discovery

in the case.  The named Plaintiffs responded to Interrogatories and produced a substantial volume

of documentary evidence related to their purchases of RMC from Defendants.  Over several

months, Class Counsel also obtained, organized and reviewed nearly 60,000 pages of documents

from the Defendants, including internal financial, transactional and operational documents, as

well as materials related to or produced during the ongoing criminal proceedings.  Levin Dec. ¶9.

Significant time and effort was also directed to the acquisition of transactional data from

each of the Defendants.  The data sought by Class Counsel related not only to the identity of

class members and total sales of RMC, but also to other factors relevant to class wide impact and

damages, such as demand, delivery times and locations, product manufacturing, pricing, and

product identification.  The effort to secure this data from all Defendants – despite a wide variety

of operating systems, data types, and data retention policies – lasted over several months.  It

required the employment of consultants and technical assistants, the input and assistance of

program manufacturers, and the assistance of Magistrate Zoss.  The effort was successful, in that

it resulted in a robust database from which the Plaintiffs' expert was able to isolate and measure

impact and damages for each of the Settlement Classes.  Levin Dec. ¶10.

Class Counsel have also reviewed and analyzed the extensive record created in the criminal proceedings.  This record includes information and documents generated by the Federal Bureau of Investigation ("FBI"), the United States Department of Transportation, and the DOJ, such as witness interviews, investigative summaries, phone records, personal financial records and calendars.  It also includes extensive transcripts of testimony provided during the criminal sentencing hearings for Defendants VandeBrake and Stewart.  Class Counsel monitored the criminal proceedings closely throughout the litigation in order to obtain any relevant information that was made available.  Levin Dec. ¶11.

Class Counsel also obtained deposition testimony from twelve individuals and corporate designees.  Deposition testimony included extensively detailed testimony from Defendant employees and officers regarding topics such as the geographic and product markets for RMC, participants and competitors in and around the geographic markets, common RMC product categories, common methods of marketing and pricing RMC products, common industry standards for the manufacture and testing of RMC, delivery and performance aspects of RMC, internal pricing, bidding and discounting practices, and the methods of recordkeeping and accounting of Defendants.  Deposition testimony also included the statements provided by core conspiracy participants VandeBrake and Stewart concerning the history of the players and plants in the market, their personal conduct in furthering the conspiracies, and their attitudes toward competition in the market.  Levin Dec. ¶12.

Even as Class Counsel were continuing to take additional deposition testimony and shore up discovery, they were working closely with Russell Mangum, Ph.D. and other economists at Nathan Associates, Inc.  After assisting Class Counsel in obtaining relevant and necessary discovery and data from the Defendants, Mangum and his assistants worked closely with Class Counsel to analyze the relevant markets, competition and pricing practices as they related to

known conspiratorial conduct.  In particular, Mangum and his assistants aided Class Counsel in the discrete identification of appropriate classes for certification, identifying the geographic and temporal limits of the conspiracies, the preparation of a Second Amended Consolidated Class Action Complaint ("Second Amended Complaint"), and an effective strategy for quantifying impact and damages.  Levin Dec. ¶13.

On March 29, 2011, Plaintiffs moved for leave to file the Second Amended Complaint, which alleged claims on behalf of three separate Classes – the Alliance/Tri-State Class, the Alliance/Great Lakes Class and the Alliance/Siouxland Class.  Each of the three Classes corresponds to one of three conspiracies also alleged, each asserts claims on behalf of a specified sub-set of Defendants, and each includes individuals and entities that directly purchased RMC from plants affected by the corresponding conspiracy during a specified Class Period.  In support of the claims and proposed classes, the Second Amended Complaint also alleges in detail the facts supporting the Defendants' antitrust violations, the nature and scope of the conspiracies themselves, and the market and product characteristics that made the conspiracies effective and resulted in class-wide damages.  Leave to file the Second Amended Complaint was granted on April 25, 2011.  Levin Dec. ¶14.

On April 1, 2011, two days after seeking leave to file their Second Amended Complaint, Plaintiffs filed their Motion for Class Certification ("Class Motion"), Supporting Brief ("Class Brief") and a supporting appendix that included a declaration by Russell Mangum, PhD. (the "Mangum Declaration").  (Dkt. 217, 218).  The Class Motion sought certification of the three Classes described in the Second Amended Complaint.  The Class Brief includes an extensive discussion of the Defendant companies and their interrelationships, the details of the three conspiracies, facts supporting the efficacy and class-wide impact of the conspiracies, the product and geographic markets for each conspiracy, and the relevant economic characteristics of the

northwest Iowa RMC market, all of which was supported by documentation included in the Mangum Declaration.  Levin Dec. ¶15.

The Mangum Declaration set out a detailed description of the northwest Iowa RMC market, the admitted and alleged conspiracies, and the Defendants' transactional data from the proposed Class Periods.  It also contained a rigorous analysis of the impact of the conspiracies on the members of the proposed Classes.  Based upon the evidence and data available, Mangum was able to prepare a detailed analysis, with empirical support, measuring the impact and damages from each of the three admitted conspiracies.  The conspiracy analyses, class definition parameters, and class damages assessments in the Mangum Declaration formed the basis for negotiations leading to the three Settlement Agreements, as well as the frameworks of the Settlements themselves.  Levin Dec. ¶16.

**C.      Settlement Negotiations**

In December 2010, Class Counsel engaged in preliminary settlement discussions with counsel for the Leniency Applicant, Siouxland.  These initial discussions were not fruitful.  In March 2011  the parties agreed that with the completion of substantial discovery, and the filing of Plaintiffs' Second Amended Complaint and Motion for Class Certification, along with the Plaintiffs' expert's initial analysis of damages, litigation was at a suitable stage to attempt mediation.  For this purpose, the parties engaged the services of The Honorable James M. Rosenbaum, retired United States District Judge for the District of Minnesota, through JAMS Resolution Experts.  Judge Rosenbaum agreed to act as mediator and the parties scheduled an initial two-day session in April 2011.  Levin Dec. ¶17.

This mediation proved to be intense, protracted, and hard fought, but ultimately successful. Counsel for the parties, individual defendants, and class representatives participated in three full-day mediation sessions with Judge Rosenbaum in Omaha in April and May of 2011.

With Judge Rosenbaum's assistance, the parties worked through a number of difficult issues concerning the scope of the claims, impact, and compensation for each of the three proposed Settlement Classes.  After these three extended mediation sessions, substantial progress was made but no agreements were reached.  Nevertheless, counsel for the parties agreed to continue negotiations in an effort to determine if they could reach a compromise suitable to all.  Levin Dec. ¶18.

After multiple additional exchanges, settlements in principle were finally reached with relevant Defendants for each of the three Settlement Classes. To facilitate the drafting and finalization of the Settlements, the deadlines for responding to pending motions were stayed with the permission of the Court.  By agreement, Plaintiffs prepared the three initial draft Settlement Agreements (with exhibits) for review by the Defendants.  This led to another major round of disputes as the parties attempted to reduce to writing the details of protracted and difficult negotiations. This stage of negotiations was again hard-fought but cooperative.  Levin Dec. ¶19.

After two exchanges of draft agreements and continued discussions among counsel, certain fundamental disagreements remained.  Counsel for all parties therefore asked Magistrate Judge Zoss to act as mediator in an attempt to resolve the remaining issues.  Following the submission of position statements to Judge Zoss regarding the still disputed provisions of the proposed Settlement Agreement, three additional mediation sessions were undertaken by phone. With the persistent efforts Judge Zoss, the parties were able to finally agree on the terms of each of the Settlement Agreements that have recently been given preliminary approval by the Court.  Levin Dec. ¶20.

The terms of these Settlement agreements are described in detail in Plaintiffs' Brief in Support of Unopposed Motion for Preliminary Approval of Settlement Agreements and

Preliminary Certification of Settlement Classes.  (Dkt. 272).  If the proposed Settlements are approved, their combined value will be $18.5 million.  Pursuant to the terms of the three Settlements and the Court's Preliminary Approval Orders, Class Counsel, with the assistance of notice and claims administrator A.B. Data, have issued direct mail notice of the Settlements to all identifiable Class members and have published notice of the Settlements in the Sioux City Journal and several local publications.  A hearing to consider final approval of the Settlements is now scheduled for November 1, 2011.  Levin Dec. ¶21.

If the Court grants final approval of the Settlements, Class Counsel will then begin the process of distributing Settlement payments, net of any awarded fees, expenses and incentive payments, to members of the three Settlement Classes.  Class Counsel intend to maximize the usefulness of transactional data obtained from the Defendants in discovery, and minimize the effort required of Class members, by providing Settlement Class members with Claim Forms that already include known RMC purchase information.  Class members will have the opportunity to provide documentation of additional or different relevant RMC purchases to the claims administrator.  After the close of the claims period, the claims administrator will then distribute the net Settlement Funds to members of each Settlement Class in proportion to the amount of their qualifying purchases of RMC as compared to all qualifying purchases (for which valid claims are submitted).  Levin Dec. ¶22.

The three Settlements represent a highly favorable result for direct purchasers who paid artificially inflated prices for RMC as a result of the conspiracies.  Each settlement will enable the respective settlement class members to recover the full amount of the overcharge calculated by Dr. Mangum for each conspiracy *after* payment from each settlement fund of the allocated expenses of the litigation, the incentive awards for class representatives, and the attorneys fees that are the subject of this Motion, if such payments are approved by the Court.  Class Counsel

respectfully suggest that this result, achieved efficiently and in a remarkably short time given the potential complexities of the litigation, support the award of attorneys' fees and reimbursement of expenses now requested.  Levin Dec. ¶23.

## III.  ARGUMENT

### A.    The Fees Requested Are Reasonable

#### 1.   The Percentage-of-the-Fund Method is Appropriate for Calculating Attorneys' Fees in This Case

The United States Supreme Court has held that lawyers who recover a "common fund" are entitled to reasonable attorneys' fees from the fund they created.  *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980) ("[T]his Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.").[4]  "It is well established in this Circuit that a district court may use the 'percentage of the fund' methodology to evaluate attorney fees in a common-fund settlement."  *Petrovic v. Amoco Oil Co*, 200 F.3d 1140, 1157 (8th Cir. 1999); *see also In re Xcel Energy, Inc*., 364 F.Supp.2d 980, 991 (D. Minn. 2005) ("In the Eighth Circuit, use of a percentage method of awarding attorney fees in a common-fund case is not only approved, but also 'well established.'"); *In re U.S. Bancorp Litigation*, 291 F.3d 1035, 1038 (8th Cir. 2002) ("We have  approved the percentage-of-recovery methodology to evaluate attorneys' fees in a common-fund settlement such as this.").

Although "[t]he Eighth Circuit . . . has not established a 'benchmark' percentage that the court should presume to be reasonable in a common fund case" (*In re Xcel*, 364 F.Supp.2d at 992

---

[4] One rationale for such awards is that "persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched."  *Boeing Co.,* 444 U.S. at 478.   The Supreme Court has repeatedly recognized the importance of private litigation in the enforcement of the antitrust laws, and the significance of class actions to this process.  *See Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983); *Reiter v. Sonotone Corp*., 442 U.S. 330, 334 (1979); *Lawlor v. National Screen Serv. Corp*., 349 U.S. 322, 329 (1955).

n.7), "courts in this circuit . . .  have frequently awarded attorney fees between twenty-five and thirty-six percent of a common fund in other class actions."  *Id*. at 998.  As discussed below, there is ample precedent in this Circuit for the one-third fee Plaintiffs have requested.

### 2.  Application of the Factors Deemed Relevant by the Eighth Circuit Supports the Requested Fees

"The Eighth Circuit has not formally established fee-evaluation factors, but it has approved consideration of the twelve factors set forth in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 719-20 (5th Cir. 1974)."  *Zilhaver v. UnitedHealth Group, Inc*., 646 F.Supp.2d 1075, 1082 (D. Minn. 2009) (citing *Easley v. Anheuser-Busch, Inc*., 758 F.2d 251, 265 (8th Cir. 1985), and *Allen v. Amalgamated Transit Union*, 554 F.2d 876, 884 (8th Cir. 1977)).  The *Johnson* factors "include: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) requisite skill to perform the legal service properly; (4) preclusion of other employment by the attorney due to case acceptance; (5) customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by client or circumstances; (8) amount involved and results obtained; (9) the attorneys' reputation, experience, and ability; (10) the case's undesirability; (11) nature and length of the professional relationship with the client; and (12) awards in similar cases."  *Id*.; *see also In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig*., 2008 U.S. Dist. LEXIS 17535, 25-26 (D. Minn. Mar. 7, 2008) ("Although '[t]he Eighth Circuit has not established factors that a district court should consider when calculating the reasonable percentage to award attorney fees in a common fund case,' nor has it 'established a "benchmark" percentage that the court should presume to be reasonable in a common fund case,' the Eighth Circuit has utilized the twelve-factor test from *Johnson v. Georgia Highway Express, Inc*., 488 F.2d 714, 719-20 (5th Cir. 1974).") (quoting *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig*., 364 F. Supp. 2d 980, 993 n.7 (D. Minn.

2005)); *see also In re Texas Prison Litigation*:, 191 F.R.D. 164, 177 (W.D. Mo. 2000) (using

Johnson factors to evaluate a percentage-of-the-fund fee award).

   An analysis of the relevant *Johnson* factors confirms the reasonableness of the requested

one-third fees in this case.  Because not all of the factors are relevant in a particular case (*see In

re Xcel*, 364 F.Supp.2d at 993 ("Plainly, not all of the individual Johnson factors will apply in

every case, so the court has wide discretion as to which factors to apply and the relative weight

to assign to each.")), and the analysis under certain of the factors is overlapping, the discussion

herein is organized to capture the *Johnson* themes of greatest significance to this case.

### a.   Time and Labor Required (Factor 1)

   Class Counsel's efforts in litigating this case to a successful resolution include extensive

investigation and discovery, as nearly 60,000 pages of documents (including internal financial,

transactional and operational documents) were obtained from the Defendants, organized, and

reviewed.  Class Counsel took 12 individual and corporate designee depositions, engaged in

several conferences with counsel for the Leniency Applicant, Siouxland, and interviewed current

and former Siouxland employees about the details of the Alliance/ Siouxland conspiracy and the

characteristics of the RMC market.  Class Counsel also obtained (with the assistance of the

Court) and carefully reviewed the voluminous record of documents and testimony from the

federal criminal investigation and sentencing proceedings.  Levin Dec. ¶24.

   Class Counsel have also engaged in extensive motion practice, having briefed responses

to Defendants' initial motions to dismiss, Plaintiffs' motion for leave to file a Second Amended

Complaint, and Plaintiffs' Motion for Class Certification.  Further, Class Counsel engaged in

motion practice and related proceedings under the supervision of Magistrate Judge Zoss related

to the discovery process, including a prolonged and difficult process of acquiring extensive data

collections from all company Defendants.  Levin Dec. ¶25.

Class Counsel spent considerable time working closely with several experts to advance the litigation expeditiously.  In addition to the extensive work with Russell Mangum and his supporting staff, Class Counsel worked with at least one independent technical consultant to aid in the process of copying and transferring data from certain Defendants' facilities.  In support of the discovery process and subsequent class certification briefing, Plaintiffs also retained an industry expert to advise them on the structure and logistics of the RMC industry and the dynamics of the RMC market.  Levin Dec. ¶26.

Class Counsel have also devoted substantial time and energy to the settlement process. These efforts included initial settlement discussions with Leniency Application Siouxland in December 2010; three full-day mediation sessions in the Spring of 2011 with Judge Rosenbaum; and three telephonic mediation sessions with Judge Zoss, all of which ultimately resulted in the resolution of heavily disputed issues and the execution of the Settlement Agreements that have been given preliminary approval by the Court.  These settlement negotiations were intense, contentious, and required substantial ingenuity on the part of all counsel to overcome multiple issues that were unique to each class.  Levin Dec. ¶27.

In a relatively brief length of time, Class Counsel advanced every major aspect of the litigation on the assumption that the case would proceed to trial, on behalf of three distinct Classes, and positioned the claims of Class members for a successful settlement effort. Accomplishing this result required, on several occasions, the full-time commitment of several attorneys and staff members, and at all times required the persistent effort of Class Counsel to prevent any slowing down of the process.  The time and labor required by Class Counsel and supporting firms was therefore substantial.  Levin Dec. ¶28.

**b.  Requisite Skill, and Novelty and Difficulty of Questions
(Factors 2 & 3)**

Courts have found that an antitrust class action is "arguably the most complex action to

prosecute.  The legal and factual issues involved are always numerous and uncertain in

outcome."  *In re Linerboard Antitrust Litig*., 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003) (quoting

*In re Motorsports Merchandise Antitrust Litig*., 112 F. Supp. 2d 1329, 1337 (N.D. Ga. 2000))

(citations and internal quotation marks omitted); *see also In re Shopping Carts Antitrust Litig*.,

MDL No. 451, 1983 WL 1950 *7 (S.D.N.Y. Nov. 18, 1983) ("antitrust price fixing actions are

generally complex, expensive and lengthy").  This case was no exception.

Plaintiffs persevered despite a substantial setback to their case when the original

Consolidated Complaint was dismissed.  In response, Plaintiffs refined their claims on behalf of

three completely separate classes to track the three conspiracies to which the Defendants had

pleaded guilty or otherwise confessed.  Though required by the developing facts of the case, this

process multiplied the complexity of the litigation.  Class Counsel were required to marshal and

reevaluate the evidence to support revamped revised pleading and to establish for purposes of

class certification the essential economic foundation necessary to demonstrate common impact

and damages for each of the newly-alleged classes.  This process also required a complex, plant-

by-plant analysis of Defendants' sales data, the competitive impact of each conspiracy on sales

from each plant involved in the conspiracy, and the ultimate impact on and overcharge damages

of each proposed Class.  Levin Dec. ¶29.

Class Counsel are confident that the result of their efforts for each proposed Class is an

accurate and complete theory of class certification, class-wide liability and damages.

Nonetheless, the Second Amended Complaint and Brief in Support of Class Certification easily

demonstrate the complexity of the evidence, and the economic and legal analysis, required to reach this result.

Class Counsel also had to rebut contentions by Defendants that no direct purchaser of RMC could have been harmed by any of the price-fixing, bid-rigging and market allocation agreements alleged by Plaintiffs.  For example, Defendants asserted that they constantly faced vigorous competition from other RMC producers in their individual market areas and that the existence of these competitors nullified the impact of the conspiracies.  Defendants further claimed that potential competitors in the form of portable RMC plants were regularly transported into their market to take work from them, and that substitute products such as asphalt also effectively prohibited them from raising their prices to supra-competitive levels.  Class Counsel also had to contend with multiple arguments by Defendants that even if there were agreements among them, they related only to bidding on a very limited number of jobs, not to their prices in general, and that even these limited agreements required the agreed low bidder to offer a so-called "fair" price that resulted in no damage to the buyer.  Levin Dec. ¶30.

### c.  Customary Fees for Similar Work in the Community, and Awards in Similar Cases (Factors 5 & 12)

Courts in this Circuit have approved numerous fee awards amount to one-third (or more) of a common fund recovered in class action litigation.  *See, e.g.*, *In re U.S. Bancorp Litigation*, 291 F.3d 1035, 1038 (8th Cir. 2002) (affirming fee award of 36% of settlement fund);  *Yarrington v. Solvay Pharmaceuticals, Inc.*, 697 F.Supp.2d 1057 (D. Minn. 2010) (awarding fee of one-third of $16.5 million settlement fund); *Nelson v. Wal-Mart Stores, Inc.*, 2009 U.S. Dist. LEXIS 71253 (E.D. Ark. 2009) (awarding fee of one-third of $17.5 million settlement fund); *In re E.W. Blanch Holdings, Inc. Securities Litigation*, 2003 U.S. Dist. LEXIS 26402 (D. Minn. 2003) (awarding fee of one-third of $20 million settlement fund); *In re Monosodium Glutamate Antitrust Litigation*,

2003 U.S. Dist. LEXIS 1970 (D. Minn. 2003) (awarding fee of one-third of $81.4 million settlement fund); *In re Engineering Animation Securities Litigation*, 203 F.R.D. 417 (S.D. Iowa 2001) (awarding fee of one-third of $7.5 million); *Johnson v. GMAC Mortg. Group*, 2006 U.S. Dist. LEXIS 74931 (N.D. Iowa Oct. 13, 2006) (awarding fee of "one-third of the settlement amount"); *Wiles v. Southwestern Bill Tel. Co*., 2011 U.S. Dist. LEXIS 64163 at *12 (W.D. Mo. June 9, 2011) (awarding fee of "roughly one-third of the fund, a number consistent with other class action cases."); *Brehm v. Capital Growth Fin., LLC*, 2010 U.S. Dist. LEXIS 9569 *13 (D. Neb. Feb. 4, 2010) ("a fee of approximately 33% of the monetary benefits recovered . . . seems reasonable."); *In re Texas Prison Litigation*, 191 F.R.D. 164 (W.D. Mo. 2000) (36% fee).

Surveys of fee awards in class actions conducted by the economics consulting firm National Economic Research Associates in 1995 and 1996 further support the petition here. Using data from 433 securities class actions, the study reports the following: "Regardless of case size, *fees average approximately 32 percent of the settlement*."  Denise N. Martin, Vinita M. Juneja, Todd S. Foster, Frederick C. Dunbar, *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions?* at 12-13 (NERA Nov. 1996) (emphasis added).  A Federal Judicial center study focused on class actions in four federal district courts—the Southern District of Florida, the Northern District of California, the Eastern District of Pennsylvania, and the Northern District of Illinois—and reported findings very similar to the National Economic Research Associates study: "Median rates ranged from 27% to 30%.  Most fee awards in the study were between 20% and 40% of the gross monetary settlement."  Thomas E. Willging, Laural L. Hooper, and Robert J. Niemic, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* at 69 (Federal Judicial Center 1996).

The requested fees also reflect the market rate in other complex, contingent litigation.  In

private litigation, "attorneys regularly contract for contingent fees between 30% and 40% directly with their clients." *See Pinto v. Princess Cruise Lines, Ltd*., 513 F. Supp. 2d 1334, 1341 (S.D. Fla. 2007) (citing *Phemister v. Harcourt Brace Jovanovich, Inc.*, 1984 U.S. Dist. LEXIS 23595 at *40-*41 (N.D. Ill. Sept. 14, 1984) ("Contingent fee arrangements in non-class action damage lawsuits are the simple method of paying the attorney a percentage of what is recovered for the client.  The more the recovery, the more the fee.  The percentages agreed on vary, with one-third being particularly common.").

        In *Robert H. Lande & Joshua P. Davis, Benefits From Private Antitrust Enforcement: An Analysis of Forty Cases,* 42 U.S.F. L. REV. 879 (2008), the authors analyzed data from 40 private antitrust cases, including the fund recovered for victims and the amount awarded in attorneys' fees.  Out of 16 cases resulting in recovery of less than $100 million, seven cases included attorney fee awards of 33.3% of the fund, one case included an attorney fee award of 33% of the fund, and three cases included attorney fee awards of 30% of the fund.  *Id*. at 911, Table 7A. Out of nine cases resulting in recovery of between $100 million and $500 million, seven cases included attorney fee awards of between 30% and 33.3%.  *Id*. at 911, Table 7B.  Only in cases in which recovery exceeded $500 million did attorney fee percentages consistently depart from this range.  *Id*. at 912, Table 7C.

        These cases and studies confirm that the prevailing market rates throughout the United States for contingent representation in litigation comparable to the present case is a contingent fee, and that the one-third requested by Class Counsel is consistent with rewards in similar litigation.   Not only is a contingent fee in this range the appropriate market rate, it is an efficient formulation that properly aligns attorneys' interests with those of their clients.

### d.   Whether the Fee is Fixed or Contingent (Factor 6)

Class Counsel have represented Plaintiffs in this litigation on a contingent fee basis, anticipating no fee or reimbursement of expenses unless they achieved success for the Classes. Levin Dec. ¶31.  "'Courts have recognized that the risk of receiving little or no recovery is a major factor in awarding attorney fees.'"  *Yarrington v. Solvay Pharmaceuticals, Inc*., 697 F.Supp.2d 1057, 1062 (D. Minn. 2010) (quoting *In re Xcel*, 364 F.Supp.2d at 994); *see also Zilhaver v. UnitedHealth Group, Inc*., 646 F.Supp.2d 1075, 1083 (D. Minn. 2009) ("This being a contingent fee case, plaintiffs' counsel assumed a financial risk.  In the Eighth Circuit, courts must take 'into account any contingency factor' where plaintiffs' counsel assumes a 'high risk of loss.'") (quoting *Brissette v. Heckler*, 784 F.2d 864, 865-66 (8th Cir. 1986)).  Despite the criminal guilty pleas entered by many of the Defendants, the risk of non-recovery (or nominal recovery) remained substantial.  The risks Class Counsel faced in pursuing this case are evidenced most obviously by the successful motion to dismiss filed by Defendants.  *Id.*

Moreover, the ability to prove antitrust impact and damages on a class-wide basis remained one of the most daunting aspects of this case. Because of the intense nature of price-fixing class actions, in which even defendants who have admitted liability vigorously contest the scope and impact of any admissions, Class Counsel were required to gather evidence, seek and maintain certification of one or more cohesive classes, establish the nature and scope of class damages, and develop trial strategies to prove their case to a jury, just as if no admissions had been made by any Defendant.  Levin Dec. ¶32.

To prove that the conspiracies "worked" – despite the ubiquitous conspirators' claim to the contrary – and that direct purchasers were damaged, Class Counsel were required to retain at their own expense economic experts who were not only highly skilled in their field but who were also extensively supported by researchers and analysts.  Class Counsel were also required to obtain,

review and analyze thousands of pages of documents and organize and maintain these materials in computer-supported databases that make relevant information available as and when needed.  More importantly, Class Counsel were required to obtain and harmonize complex data sets from each Defendant company, in order to support an analysis of impact and damages for three distinct classes.  Levin Dec. ¶33.

The attorney and supporting staff time, and the substantial cost of experts, consultants and litigation support systems required to accomplish these ends, were incurred by Class Counsel with no certainty that they will ever be recovered.  Indeed, for the past year and more Class Counsel devoted very substantial amounts of their time and energy seeking to successfully prosecute this case within the strict deadlines mandated by the pretrial scheduling order and with the intent that this case would be trial ready in the spring of 2012.  All the while, substantial risks existed with respect to Plaintiffs' ability to prove their damages to a jury in the face of the conflicting estimates that were sure to be offered by Defendants' experts.  Levin Dec. ¶34.  Success before a jury in complex litigation is always uncertain: "It is known from past experience that no matter how confident one may be of the outcome of litigation, such confidence is often misplaced." *West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971).

Moreover, even if Plaintiffs had surmounted these obstacles, obtained class certification, and won sizable judgments, collecting such judgments from Defendants would have posed additional challenges.  An interlocutory appeal from class certification would likely have been sought pursuant to Rule 23(f), and an appeal from any subsequent judgment for the Plaintiff Classes was a certainty.   Moreover, Class Counsel learned in the course of litigating this case that real concerns existed as to whether all of the Defendants would be able to pay a large judgment.  Some Defendants are modest-sized family-owned businesses with used industrial

equipment as their primary assets and outstanding debts for which that equipment already serves as collateral.  Other Defendants, while ostensibly large, are comprised of different corporate entities with varying abilities to pay, which could have presented challenging veil-piercing issues and which may have held substantial assets abroad.  Levin Dec. ¶35.

In sum, while Plaintiffs had the benefit of the U.S. Department of Justice investigation and guilty pleas entered by certain Defendants, as well as the inherent strength of their case, the ultimate success of the Plaintiff Classes was far from certain.  *See In re Charter Communications, Inc.*, 2005 U.S. Dist. LEXIS 14772, *49-*50 (E.D. Mo. June 30, 2005) (observing that although the plaintiffs "would have benefited from the . . . guilty pleas by several senior executives with respect to . . . liability issues," there were nevertheless "significant risks in proving 'loss causation[.]'").  Moreover, as explained in the next section, Class Counsel succeeded in obtaining a recovery for the Class far exceeding what the U.S. Department of Justice itself had estimated the case to be worth.

### e.  Amount Involved and Results Obtained (Factor 8)

Class Counsel have obtained an excellent result for the Class in this case.  If the proposed Settlements are approved, their combined value of $18.5 million is enough for  members of each proposed Settlement Class to recover the full value of their actual damages, as estimated by Plaintiffs' expert, even if the Court decides to award the request attorneys' fees, expenses, and incentives awards.  This outcome is all the more impressive when juxtaposed with the estimate by the U.S. Department of Justice, as stated in the VandeBrake Presentence Report, that the total volume of commerce affected by the conspiracies was just $5,666,348.61.  In other words, Class Counsel recovered *overcharge damages* for the Classes in a sum more than three times greater than DOJ's own estimate of the *total volume of commerce affected* by the conspiracy.  Levin Dec. ¶36.

As explained *supra*, this extraordinary result was obtained in the face of vigorous resistance by Defendants.  It was also obtained despite the fact that Siouxland was shielded against treble damages by its participation in the U.S. Department of Justice's amnesty program. Given the obstacles Plaintiffs would have faced if the case had not settled, Class Counsel believe the result obtained measures up very well indeed.  Levin Dec. 37.

It is also notable that Class Counsel achieved this excellent result after just a year of litigation.  To achieve this rapid resolution, Class Counsel front-loaded their efforts and investment, putting the case – with the Court's assistance – on a fast track toward trial.  The successful mediation was conducted without delay once Plaintiffs had achieved a sufficient understanding of the factual underpinnings of their case to put them in a solid negotiating position and to ensure that settlement would advance the interests of the Classes.  *Id.*

### f.  Attorneys' Reputation, Experience, and Ability (Factor 9)

The reputation and experience of Class Counsel, Greg Hansel and Irwin Levin, as well as that of their respective firms, Preti, Flaherty, Beliveau & Pachios, LLP and Cohen & Malad, LLP, was presented to this Court little more than a year ago when each was seeking a leadership appointment by the Court and need not be repeated here.  Simply stated, Class Counsel are experienced antitrust class action attorneys who have attempted to honor the Court's appointment by prosecuting this litigation with a high degree of skill and dedication on behalf of Class members.  Class Counsel believe that their abilities, and those of their supporting colleagues, is evidenced by the course of proceedings over the past year and the excellent Settlements achieved.  *See In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 261 (D. Del. 2002) (Class counsel "showed their effectiveness . . . through the favorable cash settlement they were able to obtain").

### g.   Preclusion of Other Employment (Factor 4)

The substantial amount of time expended to date on this case by Class Counsel represents

a major investment of professional time that could otherwise have been devoted to other gainful

employment.[5]  Levin Dec. ¶¶ 38-39.

### B.   Class Counsel's Expenses Were Reasonable and Necessary to Achieve the Benefits Obtained for the Class

"Reasonable costs and expenses incurred by an attorney who creates or preserves a common

fund are reimbursed proportionately by those class members who benefit by the settlement."

*Yarrington v. Solvay Pharmaceuticals, Inc.*, 697 F.Supp.2d 1057, 1067 (D. Minn. 2010) (internal

quotation marks omitted); *see also Zilhaver v. UnitedHealth Group, Inc.*, 646 F.Supp.2d 1075,

1084 (D. Minn. 2009) ("The common fund doctrine provides that a private plaintiff, or plaintiff's

attorney, whose efforts create, discover, increase or preserve a fund to which others also have a

claim, is entitled to recover from the fund the cost of his litigation . . . .").  Class Counsel and

supporting firms have incurred $911,445.92 in unreimbursed litigation-related expenses through

July 31, 2011, including expert fees, computerized research fees, document and data management

---

[5] Courts in this Circuit may (but are not required to) check the reasonableness of a proposed fee award by comparing it with the actual hours and billing value of the time class counsel expended on the case.  The "lodestar cross-check" in this case reveals that Class Counsel and supporting firms have devoted 12,171.90 hours to investigating claims, reviewing documents, propounding and taking discovery, and negotiating and documenting the Settlements.  Levin Dec. ¶¶38-39.  The aggregate lodestar for Class Counsel and supporting firms is $4,933,057.25.  *Id.*  The requested attorneys' fee of $6,166,667 reflects a lodestar multiplier of 1.25, a figure well below what courts have awarded in numerous cases.  *See, e.g.*, *In re Charter Communications, Inc., Securities Litigation*, 2005 US Dist. LEXIS 14772 (E.D. Mo. 2005) (lodestar multiplier of 5.6); *In re Xcel Energy, Inc.*, 364 F.Supp.2d 980 (D. Minn. 2005) (lodestar multiplier of 4.7); *In re BankAmerica Corp. Securities Litigation*, 228 F.Supp.2d 1061 (E.D. Mo. 2002) (lodestar multiplier of approximately 3); *Yarrington v. Solvay Pharmaceuticals, Inc.*, 697 F.Supp.2d 1057 (D. Minn. 2010) (lodestar multiplier of 2.26); *Nelson v. Wal-Mart Stores, Inc.*, 2009 U.S. Dist. LEXIS 71253 (E.D. Ark. 2009) (lodestar multiplier of 2.5); *In re Engineering Animation Securities Litigation*, 203 F.R.D. 417 (S.D. Iowa 2001) (lodestar multiplier of approximately 3); *In re Monosodium Glutamate Antitrust Litigation*, 2003 U.S. Dist. LEXIS 1970 (D. Minn. 2003) (lodestar multiplier of *In re Monosodium Glutamate Antitrust Litigation*, 2003 U.S. Dist. LEXIS 1970 (D. Minn. 2003) (lodestar multiplier of approximately 2).

costs, travel and lodging expenses, copying costs, the cost of court reporters and deposition transcripts, and filing fees.  Levin Dec. ¶¶40-41.  Reimbursement of such expenses is generally permitted.  *See, e.g.*, *Oh v. AT&T Corp.*, 225 F.R.D. 142, 154 (D.N.J. 2004).  These expenses were reasonably incurred and necessary to successfully position the case for class certification, anticipated dispositive motions, and the successful trial of the Classes' claims.  These expenses undoubtedly contributed to the Defendants' willingness to settle those claims on favorable terms.

Because it would be impractical to allocate specific expense items to specific settlements, Plaintiffs request that their expenses simply be allocated to each Settlement Fund in proportion to the size of each Fund.

### C.   The Court Should Approve Incentive Awards in the Amount of $10,000 to Each Class Representative.

"Courts routinely recognize and approve incentive awards for class representatives . . . ." *Wineland v. Casey's General Stores, Inc.*, 267 F.R.D. 669, 677 (S.D. Iowa 2009); *see also id.* at 678 ("[T]he Court finds that the named Plaintiffs took substantial action to step forward and pursue the present litigation. …. Through these actions, significant benefits on behalf of all Settlement Class members have been achieved. Accordingly, the Court concludes that the preferential treatment of the named Plaintiffs and deponents is not excessive, but is fair and reasonable under the circumstances."); *see also In re US Bancorp Litigation*, 291 F.3d 1035, 1038 (8th Cir. 2002) (citing Seventh Circuit for proposition that "relevant factors in deciding whether incentive award to named plaintiff is warranted include actions plaintiff took to protect class's interests, degree to which class has benefitted from those actions, and amount of time and effort plaintiff expended in pursuing litigation"); *Zilhaver v. UnitedHealth Group, Inc.*, 646 F.Supp.2d 1075 (D. Minn. 2009) (approving incentive awards of $15,000 to named plaintiffs

who "bore the risks of counterclaim or collateral attack, and consulted with class counsel throughout the suit.").

In this case, each of the named Plaintiffs made a most important contribution, by stepping forward on behalf of others to remedy a wrong in a relatively tight-knit industry.  As members of the proposed Plaintiff Classes, the named Plaintiffs could have simply awaited the outcome of the litigation and received the same benefits as any other class member.  Instead, they committed to participate actively in what promised to be a lengthy and hard fought lawsuit against their corporate suppliers on behalf of a large group of potential class members.  From the beginning, the named Plaintiffs have been made aware that an incentive fee is not a foregone conclusion but was a possibility, and would be left to the Court's discretion.  Now that a substantial interim recovery has been made for the Settlement Classes, however, the Plaintiffs' valuable services and commitment to date should be recognized.  Levin Dec. ¶42.

The named Plaintiffs in this case, Randy Waterman, Frank Audino Construction, Inc., Sioux City Engineering Co., the City of Le Mars, Iowa, Holtze Construction Company and Brown Commercial Construction, Inc. have each made substantial contributions on behalf of Settlement Class members.  Each Plaintiff, through one or more representatives, has participated in multiple in-person and/or telephone conferences, including extensive meetings to prepare discovery responses.  Each Plaintiff has provided answers to interrogatories, has reviewed their current and archived records, has produced documents responsive to requests, and has allowed Class Counsel's consultants to access their computer systems and servers and download data for production.  Some of the Plaintiffs have conferenced by phone with the Plaintiffs' expert, and at least two appeared personally during the mediation process.  Levin Dec. ¶43.

Each Plaintiff has provided invaluable assistance and demonstrated an ongoing commitment to protecting the interests of Class members. The requested incentive award of

$10,000 for each Plaintiff recognizes this commitment and the benefits secured for other Class members and is therefore reasonable under the circumstances of this case.  Levin Dec. ¶44.

**III.   CONCLUSION**

Under the factors deemed relevant in the Eighth Circuit, the requested fees of one-third of the Settlement Funds would provide fair and reasonable compensation for the efforts in this litigation of Class Counsel, who incurred the risk of non-payment and have worked tirelessly and efficiently on behalf of the Class to secure a favorable outcome.  The requested fees are in line with other fees awarded in this Circuit in comparable cases, and its reasonableness is confirmed by a lodestar cross-check.  The requests for reimbursement of litigation expenses and for incentives awards to class representatives are also reasonable, and should be approved.

Respectfully submitted,

*/s/ Irwin B. Levin*
Irwin B. Levin
Scott D. Gilchrist
COHEN AND MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN  46204
Telephone: (317) 636-6481
Facsimile: (317) 636-2593
ilevin@cohenandmalad.com
sgilchrist@cohenandmalad.com

*/s/ Gregory P. Hansel (by consent)*
Gregory P. Hansel
Randall B. Weill
Joshua R. Carver
PRETI, FLAHERTY, BELIVEAU  &
PACHIOS, LLP
One City Center
P.O. Box 9546
Portland, ME  04112-9546
Telephone: (207) 791-3000
Facsimile: (207) 791-3111
ghansel@preti.com
rweill@preti.com
jcarver@preti.com

**Settlement Class Co-Lead Counsel**

**Settlement Class Co-Lead Counsel**

Mark L. Zaiger
Jennifer E. Rinden
SHUTTLEWORTH & INGERSOLL, P.L.C.
115 Third Street SE, Suite 500
P.O. Box 2107
Cedar Rapids, IA  52406-2107
Telephone: (319) 365-9461
Facsimile: (319) 365-8564
MLZ@ShuttleworthLaw.com
JER@ShuttleworthLaw.com

**Plaintiffs' Liaison Counsel**

**<u>CERTIFICATE OF SERVICE</u>**

   I hereby certify that on September 2, 2011, the attached document was electronically transmitted to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to all registered counsel of record.

/s/ *Irwin B. Levin*
Irwin B. Levin
COHEN AND MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN  46204
Telephone: (317) 636-6481
Facsimile: (317) 636-2593
ilevin@cohenandmalad.com
